State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**STATE COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| QUANTUM IQ, LLC, | ) |
| | ) |
| Plaintiff, | )    Civil Action File No. |
| | ) |
| v. | ) |
| | ) |
| DANIEL ROTH, MICHAEL | ) |
| PALMER, RANDY SMITH, | ) |
| JONATHAN HOLLIS, JUSTIN MIZE, | ) |
| EASTGATE WORLDWIDE, LLC, and | ) |
| PANGEAEFFECT LLC, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff QUANTUM IQ, LLC ("Quantum" or "Plaintiff"), is a Georgia limited liability company with its principal place of business at 11175 Cicero Drive, Suite 500, Alpharetta, GA, 30022, USA.

2.      Defendant DANIEL ROTH ("Roth") is a citizen of Georgia. At all relevant times he resided in Georgia. He may be served at his residence located at 2652 S Main St., Apt 1373, Kennesaw, GA 30144.

3.      Defendant MICHAEL PALMER ("Palmer") is a citizen of Georgia.  He may be served at his residence located at 536 Branyan Trail, Alpharetta, GA 30004.

4.      Defendant EASTGATE WORLDWIDE, LLC ("Eastgate") is a citizen of Wyoming and may be served at its principal office 3460 Preston Ridge Road, Suite 150, Alpharetta, Georgia 30005.

5.      Eastgate is not registered as a Georgia entity or a foreign company authorized to do business in Georgia.

6.      Since November 11, 2024, Palmer has represented himself to be the owner of Eastgate, and an advisor to the non-profit entity Guardian Independent Operator Association, Inc. ("GIOA") in his

FINRA Registration and Employment History disclosures. Palmer also identified Eastgate as being located at his residence, 536 Branyan Trail, Alpharetta, GA 30004. Palmer has GIOA email addresses, as well.

7.      Defendant PANGEAEFFECT LLC ("Pangea") is a citizen of South Dakota and may be served at 401 E 8th St, Suite 214, Sioux Falls, South Dakota 57103.

8.      Pangea is not registered as a Georgia entity or a foreign company authorized to do business in Georgia.

9.      In its annual report, Roth is identified as the beneficial owner of Pangea. Roth is the sole organizer identified in Pangea's Articles of Organization which are dated July 15, 2024.

10.     Defendant RANDY SMITH ("Smith") is a citizen of Georgia.  He may be served at his residence located at 3620 Ridgewater Trail, Marietta, Georgia 30068.

11.     Defendant JONATHAN HOLLIS ("Hollis") is a citizen of Georgia.  He may be served at his residence located at 1307 Marietta Country Club Dr NW, Kennesaw, Georgia 30152.

12.     Defendant JUSTIN MIZE is a citizen of Florida.  He may be served at his residence located at 16434 75th Way N., West Palm Beach Florida 33418.

13.     The amount in controversy of this case exceeds $1,000,000.00 (one million dollars).

14.      Venue is proper in this County under Ga. Const. 1983, Art. VI, §2, ¶ IV.

15.      Jurisdiction is proper in this Court pursuant to Ga. Const. Art 6, §IV, O.C.G.A. §15-7-4.

16.     The Court may exercise personal jurisdiction over Defendants Smith, Hollis, Mize and Palmer as each of these people was acting individually, outside the scope of any offices they held with GIOA or any other corporate entities, and each of them committed torts in Georgia for which they are personally liable.

17.     The Court may exercise personal jurisdiction over Defendants Roth, Mize, Eastgate and Pangea under Georgia's long-arm statute. Roth worked in Georgia and frequently interacted with Quantum and its employees in Suwanee, Georgia; his work was supported by Quantum's office in Georgia; Roth, Mize, Eastgate and Pangea misappropriated, converted and used Quantum's non-trade

secret confidential information, assets and personal property in Georgia; and their tortious acts were committed in Georgia. Roth advertised that he was partnering with Eastgate and Pangea to recruit employees for work in Georgia. Therefore, Defendants purposefully availed themselves of this Court's jurisdiction by conducting activities in Georgia. Moreover, Quantum's claims arise out of Defendants' contacts with Georgia, as Quantum's property that Defendants took by material misrepresentations and material omissions is located in Georgia.

18.     The Court may exercise personal jurisdiction over Defendants Roth, Palmer, Eastgate and Pangea because they knowingly interfered with a contract containing a forum selection clause designating Georgia as the proper forum.

19.     The Court may exercise personal jurisdiction over Defendants Smith, Hollis, Roth and Palmer because they are all residents of Georgia.

## FACTUAL BACKGROUND

### The Formation of GIOA

20.     In the wake of Chick-fil-A's 2020-2021 decision to discontinue corporate-sponsored health insurance for its operators, a group of independent Franchisee Operators ("Operators") came together to create a nonprofit association designed to serve their collective benefits needs. The result was the formation of GIOA, a Georgia-based nonprofit entity dedicated to providing insurance solutions and support services to Franchisees and their employees nationwide.

21.     Initially, GIOA was run by a volunteer Board of Directors comprised of Operators who were purportedly committed to the mission of supporting fellow franchisees. The Executive Board was comprised of Hollis (President), Mize (Treasurer), Alex Vann (Secretary) and Smith (Executive Director - Retired).

22.     Over the course of a few short years, the Executive Board raised the compensation paid to themselves by GIOA to six-figures and embarked upon a strategy of creating outside for-profit companies to financially profit from their relationships with other GIOA Operators.

**The Relationship Between Quantum and GIOA**

23.     In late 2021, GIOA entered into a Professional Services Agreement ("PSA") with Quantum —a Georgia-based operational and administrative services firm. The PSA appointed Quantum to a five-year contract term as GIOA's exclusive outsourced partner for building and managing GIOA's day-to-day infrastructure, including member services, data systems, event management, onboarding workflows, carrier coordination, CRM platforms, and vendor management. The PSA was effective January 1, 2022. A copy of the PSA is attached as Exhibit "A."

24.     Under Quantum's management, GIOA grew into one of the largest Operator-led health associations in the country. Membership exceeded 1,400 Operators, and Quantum's call center, technology stack, and vendor relations supported over $100 million in annual insurance premiums.

25.     The PSA's Statement of Work "covers [Quantum's] delivery of Services, deliverables and Work Product … relating to [Quantum] serving as a back office administrative arm of GIOA & Operator facing concierge service team." See Exhibit "A."

26.     The PSA provides that each party (GIOA and Quantum) "shall maintain in strict confidence, and agrees not to disclose to any third party, except as necessary … when authorized in writing by the other party (a 'Discloser'), Confidential Information that Recipient receives from Discloser or Discloser's Affiliates." The PSA defines "Confidential Information" to include "trade secrets … and any other non-public information or material (whether in writing or retained as mental impressions) concerning Discloser or Discloser's Affiliates." Id.

27.     Under the PSA, Quantum's responsibilities included onboarding, communications, vendor management, administration, dashboard infrastructure, membership development, and Grow Fund management. Quantum operated two distinct divisions: (1) a Concierge Call Center and (2) a membership department. The membership department was physically separate from the Concierge Call Center, with different employees.

28.     Quantum was responsible to maintain, grow, buildout and service GIOA membership for franchisee Operators and their employees.

29.     Quantum created a "Concierge Call Center" for GIOA by hiring dedicated employees, solving GIOA's poor customer service issues and managing poor broker service which existed prior to the PSA. Quantum also created a dedicated "membership department," managed the "Grow Fund," and implemented scalable systems to support national expansion.

30.     The Grow Fund was an account that was funded by insurance carrier credits designated for the support of Quantum's membership department and was tied directly to Quantum's contractual responsibility under the PSA to "Create and Run a Membership Department." See Exhibit A, Statement of Work #1 §8.

31.     The PSA provided business opportunities, protectable business value and advantages for Quantum and is an asset and intangible personal property of Quantum's.

### The Defendants' Misconduct and the Background of this Lawsuit

32.     This lawsuit is brought against certain individuals - Hollis, Mize, Smith, and Palmer - in their individual capacities based upon conduct they engaged in when they acted or assisted and/or in which they were aided and abetted by other individuals including Roth and Glynnis Waters, outside the scope of any offices they held with GIOA, and each committed torts in Georgia for their personal gain. In furtherance of their scheme, these individuals secretly formed or supported corporations (including Eastgate and Pangea and, upon information and belief, additional shell companies) to deprive Quantum of its PSA contract and convert to their own use Quantum's business opportunities, assets, revenues, staff, data, non-trade secret confidential proprietary property, and infrastructure.

33.     Hollis, Mize, Smith, and Palmer were entrusted with governance and advisory roles at GIOA. But instead of acting in accordance with their duties and fiduciary responsibilities to the non-profit GIOA and to Quantum, they acted outside the scope of their positions to personally enrich themselves and establish for-profit entities that would seize control of Quantum's operations and/or take over the back office operations of GIOA for their own personal gain.

34.     In December 2023, Hollis, Mize, Smith and Executive Board member Alex Vann began exploring ways to generate money for themselves, from which they could personally profit, and

ultimately take over Quantum's role—not to better serve Operators, but to redirect the revenue streams and systems Quantum had built into privately controlled businesses.

## The Wyoming Entities, Rolex Watches and a Sprinter Van: Defendants' Attempts to Utilize GIOA Funds for Their Own Benefit

35.    In December 2023, Hollis's attorney, Marc Dearth, formed three Wyoming-based Limited Liability Companies to be owned by Johnathan Hollis, Randy Smith, Alex Vann, Justin Mize, Michael Palmer (Manager), Eric Downey and John Drye, Quantum's CEO.  The companies were Montage Endeavors, LLC, Montage Worldwide Limited, LLC, and Montage Management Limited, LLC (collectively the "Montage entities") and were selected to be formed in Wyoming due to the secrecy of the ownership reporting laws in that state.

36.    In December 2023, Hollis and then Executive Director Smith sought to purchase a property located at 5500 Koweta Road in College Park, GA 30349 to be owned by the Wyoming LLC called Montage Endeavors, LLC in which they would have ownership. Hollis claimed while they would own the assets, they would vote to have GIOA pay for the property on a contract basis to house GIOA Chick-fil-A Operators visiting Atlanta.  They went as far as to try to execute a Non-Disclosure Agreement to hide the transaction through Smith's daughter Jamie Grace Miller, who was a real estate agent.

37.    In January 2024, Hollis asked that Quantum purchase seven Rolex watches as gifts for the GIOA Executive and non-executive Board members.  A watch dealer in Texas, Philip Wolf, was introduced to Quantum's CEO by Hollis for the purchase.  When Quantum's CEO talked to Mr. Wolf and discovered more fully what was being asked, Quantum refused the request.  Hollis then suggested that Quantum use excess insurance carrier credits—known internally as the "Grow Fund"— to purchase the luxury Rolex watches for GIOA Board members. Quantum again refused, stating such purchases were not only improper but potentially unlawful under the non-profit governance structure.

38.    In January 2024, Hollis schemed for either himself or members of the Montage Entities to purchase a Sprinter Van to be "funded by GIOA" to start to build assets and income off of the many

GIOA independent Operators with whom Hollis had a connection. Again, the CEO of Quantum was placed in a position to refuse and communicate to Hollis that diverting non-profit monies into for-profit entities owned by the non-profit Board members was not appropriate.

## The Beginning of the Deterioration of the Relationship
## Between Quantum and the Defendants

39.     Quantum and its CEO were repeatedly put in the position of having to tell Hollis "NO" to these proposals and requests as Quantum's CEO believed that many of the ideas Hollis and other GIOA Board members were suggesting were purely for the purpose of putting money in their pockets and were either arguably unethical, potentially illegal or created an appearance of impropriety for a non-profit.  These repeated negative responses to more and more aggressive "asks" by Hollis started to strain the relationship between Hollis and the CEO of Quantum.

40.      On January 29, 2024, at a GIOA meeting that Quantum representatives had been asked to attend at a golf resort in South Carolina, Palmer, a financial associate of Hollis and owner of Eastgate, told Quantum's CEO that Hollis "wanted to take over Quantum" and that "he (Palmer) was out" of discussions that were going on where the GIOA executive Board members as individuals would be part of for-profit limited liability companies formed in Wyoming by Jonathan Hollis' attorney Marc Dearth (the Montage entities).

41.     Quantum's CEO confronted Hollis about this and Hollis refused to discuss the matter in front of other GIOA Board members.

42.     These Montage entities were not formed only to serve the Operator community. Instead, the Montage entities, along with Eastgate and Pangea, were formed to usurp Quantum's role and provide Hollis, Mize, Palmer, and Roth with a direct financial interest in GIOA's operations — something Hollis, Mize and Palmer were legally and ethically prohibited from doing as Officers and Board Advisors of a non-profit corporation.

43.     On January 29, 2024, Hollis, acting through his position as President of the GIOA Executive Board, demanded that Quantum representatives leave the meeting they had been asked to attend in South Carolina.

44.     Behind the scenes and unbeknownst to Quantum, Hollis, Mize and Palmer were executing a coordinated campaign to replace Quantum.

45.     As part of this plan, Defendants were forming additional for-profit entities to assist them in their scheme to not only displace Quantum but to also improperly divert funds from GIOA to the Defendants in their individual capacities.

46.     By way of one example, on February 12, 2024, Eastgate was formed in Wyoming by Heidi Thomas, an employee of Marc Dearth, listing a Georgia address as its headquarters. Marc Dearth is Hollis's and Palmer's attorney.

47.     Additionally, on July 15, 2024, Pangea was formed by Roth and registered as a South Dakota limited liability company.

**Defendants' Manufacturing of Alleged Breaches of the PSA By Quantum**

48.     During this same time frame in 2024, Hollis,  Mize, and Smith continued to further shift their approach from partnership with Quantum to sabotage by manufacturing pretextual breaches of the PSA by Quantum in order to terminate the PSA and Quantum. For example, Hollis and Mize, falsely claimed Quantum was mismanaging the Grow Fund, despite being presented a 1,000+ page audit report and documented receipts demonstrating their approval of the very expenses they later purported to find objectionable. They also demanded a retroactive audit and threatened termination of the PSA.

49.     On April 15, 2024, Palmer asked Quantum to provide membership lists for GIOA members that Quantum was serving pursuant to the PSA, including personally identifiable information (PII) that constituted privacy protected information.  Palmer was not authorized under the PSA to receive this information.  After Quantum questioned the propriety of and lack of a data sharing agreement for the request, Hollis instructed a Quantum employee to provide it to Palmer.  The membership lists constitute Confidential Information pursuant to the PSA.

50.      On April 23, 2024, Quantum notified Hollis that because Palmer's request sought personally identifiable information that is beyond a typical mailing list database, GIOA should have a data sharing agreement with Palmer before giving him access in order to follow compliance protocols. Hollis nevertheless directed Quantum to release the data to Palmer without such an agreement.

51.      On May 17, 2024, Smith demanded that Quantum immediately transfer the Grow Fund to GIOA, stating that GIOA is taking it over, claiming that GIOA did not need this money to be managed, and that no formal amendment to the PSA or SOW was needed. Smith suggested that salary payments and other employee expenses were due to be reimbursed to GIOA, implying a breach of the PSA.

52.      On July 12, 2024, GIOA demanded Quantum provide a License Agreement for the use of GIOA names and associated logos, icons, marks and materials. The demand from GIOA's attorney, Rob Breunig, included a provision that allowed GIOA to terminate Quantum for cause if the "standards" (which would be formed at a later date) were violated.  When Quantum requested the standards be provided prior to signing the License Agreement, Quantum's request fell on deaf ears and no further demand or response was provided by GIOA.

53.      On July 16, 2024, GIOA Executive Board Members demanded Quantum pay GIOA $208,899.51 purportedly based upon a retroactive audit of 2023 and 2024 Grow Fund expenses. At the same time, GIOA threatened the cancellation of the PSA, to be effective on August 19, 2024.

54.      On August 16, 2024, Quantum provided nearly 2,000 pages of documentation, audits, receipts and approvals of expenses showing every penny of the $208,899.51 had been authorized by GIOA, appropriately accounted for by Quantum and spent exclusively for GIOA's benefit.

55.      Nevertheless, on August 19, 2024, GIOA purported to cancel the PSA with Quantum.

56.      On October 2, 2024, GIOA President Hollis demanded that Quantum record all Concierge Call Center calls weekly, purportedly to assist in training a GIOA AI-based knowledge platform. This would have required recording hundreds of calls across all 50 states, many of which contained private and confidential personal health information due to the insurance and healthcare nature of the calls.

57.     Quantum provided guidance related to the compliance problems associated with the request to record calls and offered consultation with its own legal counsel to discuss these issues, only to ultimately have this request also be completely ignored by Hollis.

**The Infiltration of Quantum By Defendant Roth Under False Pretenses**

58.     On or about October 15, 2024, Defendant Hollis requested that two individuals—falsely represented as newly hired GIOA employees—be allowed to visit Quantum's Georgia call center to "observe and learn" about its membership services. In particular, Hollis arranged for Defendant Roth to be introduced to Quantum staff representing him to be as a GIOA employee. In reliance on Hollis's representation, Quantum granted Roth access to restricted operational areas and staff processes. In truth, Roth was not employed by GIOA at any time.

59.     The visit was a pretext to acquire confidential business information related to Quantum's call center protocols, onboarding scripts, and member engagement systems. These assets were later misappropriated by Eastgate and other entities associated with Defendants. The deliberate misrepresentation of Roth's employment status and the surreptitious collection of internal operational data constitute acts of fraud, deception, and non-trade secret theft in furtherance of Defendants' broader unlawful scheme.

60.     Upon his arrival at Quantum's Suwanee, Georgia offices on October 16, 2024, Roth introduced himself as a "friend of Jonathan Hollis and consultant" and stated that he was there to be "helping through the open enrollment and busy seasons" and "helping with Jonathan and analytics around [the] enrollment piece." Roth spent the day training with the Quantum team in Suwanee, Georgia, and requested internal reporting and operational data from Quantum.

61.     Roth was not an employee of GIOA but was, in fact, the founder of Pangea, unbeknownst to Quantum. When Quantum staff asked Roth where he was from, he replied that he (Roth) and his wife, who would later be identified as an employee of Eastgate, had lived in the Sugar Hill, Georgia area but were currently living in a van and travelling around.

62.     While embedded in Quantum's offices, Roth asked for and collected operational reports, training documents, internal analytics, HelpScout configurations, call flow logic, Quantum institutional knowledge and proprietary templates.  He spent an entire day listening to calls, observing employees while they worked and taking notes on his observations. Included among Roth's access to Quantum's confidential proprietary information were:

    a.   Live new membership calls and related backend processes;

    b.   Live service calls and related backend processes;

    c.   Internal documentation of structure;

    d.   Onboarding call training videos; and

    e.   Quantum duties.

The foregoing information essentially provides individuals with how Quantum structures its operations.  Quantum allows this information to be distributed to business partners who work with Quantum, but does not allow it to be distributed to the general public. Quantum does not consider this information to be a trade secret but restricts its use for only legitimate business purposes. This information provides great insight into Quantum's operations, and if a competitor (such as Eastgate or Pangea) had access to this information, it would gain an unfair advantage in the marketplace.

63.     Quantum's internal reporting, Help Scout platform and operational data are the proprietary and confidential property of Quantum.

64.     Quantum reasonably and justifiably relied upon Roth's representations and provided him with confidential business processes in furtherance of the stated purpose of Roth's visit.

65.      Quantum trusted Roth, Palmer and Hollis to protect and develop its business interests and its relationship with GIOA pursuant to the PSA and to act in the best interest of Quantum and GIOA, and in the spirit of the PSA, at all times.  For this reason, Roth, Palmer and Hollis were, whether formally or informally, a fiduciary to Quantum, and they were each required to deal in the best of good faith with Quantum and refrain from self-dealing.  Roth, Palmer and Hollis owed a duty of utmost loyalty to Quantum.

66.    Upon information and belief, Roth, Palmer and Hollis had no intention of assisting Quantum in membership growth. Instead, Roth, Palmer and Hollis obtained Quantum's confidential proprietary information, business processes and data under false pretenses in connection with a larger scheme which included GIOA's directors and officers (acting independently of and contrary to the interests of GIOA) to harm Quantum under or through, or in spite of, the PSA.

67.    Within weeks of Roth's October 2024 visit to Quantum's offices, Eastgate and Pangea launched their own Member Services Center. Job ads soon appeared on LinkedIn and OysterLink for positions that mirrored Quantum's own staffing titles. The Eastgate call center began answering GIOA Operator inquiries using similar scripts, systems, and processes blatantly copied from Quantum.

68.    Roth, Palmer and Hollis engaged in self-dealing and other conduct that was directly contrary to Quantum's interests by stealing Quantum's business processes and confidential information.

69.    Defendants Roth, Palmer, Hollis, Eastgate and Pangea, individually or through the actions of their agents, employees, or representatives including but not limited to Maddy Mordenti and Glynnis Waters made or disseminated, or caused to be made or disseminated to Quantum, false and misleading material representations and omissions. The making or dissemination of such false and misleading representations was fraudulent and unlawful, designed and intended for obtaining Quantum's non-trade secret confidential information and Quantum's property under false pretenses. Hollis and Roth initiated a covert effort to access and replicate Quantum's operations, including its confidential information systems and internal operations by sending Roth into Quantum's Suwanee, Georgia call center.

**Defendants' Improper Attempts to Steal Away Quantum Employees and Further Improper Demands for Business Information From Quantum**

70.    Roth served as the Founder and President of Pangea, which upon information and belief, also conducts business as Eastgate.

71.    Eastgate holds itself out as an entity which purportedly provides high-level global business administration and CRM services to other companies.

72.    In October 2024, a GIOA 411 website was created as another help center for GIOA, in addition to the call center operated and managed by Quantum under the PSA.

73.    Palmer received a personal email address for GIOA 411.

74.    In or about October 2024, Roth identified himself as on his LinkedIn profile as the founder of Pangea and posted on his LinkedIn profile: "We are #hiring! PangeaEffect is thrilled to partner with Eastgate Worldwide to recruit five passionate Member Advocates for a brand-new Member Services Center launching in Kennesaw, GA!"

75.    On November 11, 2024, a posting appeared on OysterLink stating that "Eastgate Worldwide is recruiting dedicated Member Advocates for a start-up Member Services center in Kennesaw, GA."

76.    In November 2024, Pangea partnered with Eastgate to recruit five Member Advocates.

77.    Telephone calls to the telephone number on Eastgate's website show the telephone number (470-876-7272) is a direct line to the GIOA member call center (855-446-2411) even though Eastgate's website represents it has over one thousand satisfied customers.

78.    In December 2024, Mize threatened that GIOA would withhold payment that was owed to Quantum unless Quantum facilitated the export of extensive proprietary data, including all member interactions, internal templates, KPI metrics, and proprietary configurations developed by Quantum in service to GIOA. Mize directed that this data be delivered to Hollis, framing the demand as a condition for releasing funds contractually due under the PSA. This demand came at a time when Hollis, Mize, and their associates were actively building replacement entities—Eastgate and Pangea— intended to seize control of Quantum's infrastructure, operations, and personnel.

79.    During this same time period, in late 2024 and early 2025, Hollis and Mize started a campaign to hire employees away from Quantum and its related sister companies. No less than four employee attempts were made, with one being successful.

80.    At the direction of Hollis, GIOA staff were also involved with the recruitment process— including Kelly Mullis, the Board's assistant, who attempted to recruit Quantum employees by taking one out of the office to a local coffee shop during work hours to pitch the move.

81.    In 2023, Mize had requested Quantum's CEO to hire his mother, Debbie Mize, and Quantum's affiliated sister company hired her.  Debbie Mize was trained and operated within some of the same platforms and confidential proprietary systems used by Quantum to support GIOA's membership and service infrastructure. In early 2025, amid ongoing efforts to extract data and personnel from Quantum, Mize hired his mother into Eastgate—a company formed to replace Quantum. Upon her departure, Debbie Mize declined to reveal her new employer, stating only that she would "work less and be paid more." Her recruitment, timed alongside Mize's demands for proprietary data from those same systems, evidences the deliberate effort to transfer institutional knowledge and replicate Quantum's operational model for personal benefit.

82.    On December 19, 2024, GIOA asserted that the PSA had been terminated on August 19, 2024, and stated, for the first time, that pursuant to Section 9.c. of the PSA a wind down of Quantum's services concluded on December 19, 2024.

83.    At all material times, Defendants Roth, Palmer, Eastgate and Pangea were direct competitors of Quantum. Roth was a former agent, representative or employee of GIOA who currently works for Eastgate and Pangea.

84.    For months prior to GIOA's purported conclusion of Quantum's services on December 19, 2024, Roth, Palmer, Eastgate and Pangea were actively engaged in performing services for GIOA that were the services being performed by Quantum and that were the subject of the PSA.

85.    As an agent, representative or employee of GIOA, Roth, Palmer and Hollis were responsible for learning, onboarding, communications, vendor management, administration, dashboard infrastructure, membership development, and Grow Fund management from Quantum.  In connection therewith, and in reliance upon the material misrepresentations and material omissions by Roth, Palmer and Hollis as to who Roth was and what his function or purpose was, Quantum provided Roth and Palmer with its business practices, Confidential Information (as defined by the PSA) and Quantum's valuable confidential proprietary information not generally known to the public such as management platforms and operations in those platforms, vendor lists; account, marketing, and pricing

information; sources of supply; means and methods of operation; and procedures in connection with the performance of its duties.

86.    Roth, Mize and Hollis embarked on a campaign to recruit other employees of Quantum, and Quantum's sister companies, to work at Eastgate and Pangea, including Meg Anderson, Megan Williams, Michelle Sutter and Debbie Mize (Justin Mize's mother).

87.    Roth undertook management of the GIOA 411 call center and used Eastgate and Pangea to knowingly recruit and insert unqualified staff members into positions within GIOA 411, in concert with certain Board Members of GIOA who sought to undermine GIOA's compliance with the PSA for their personal gain, including Smith, Hollis, and Mize, and intentionally interfere with the rights and obligations of GIOA and Quantum under the PSA.

88.    HelpScout is a proprietary system licensed to Quantum and built out by Quantum in a way that constitutes confidential proprietary business systems.

89.    In November and December of 2024, Hollis and Mize demanded that Quantum provide them with access to Quantum's HelpScout CRM account, including, but not limited to, all conversations, customer data, knowledge base content, survey responses (including verbatims), KPI performance history, email templates, and any other Plan-related data in Plaintiff's possession or control.

90.    Hollis and Mize's demand to access and migrate HelpScout platform data lacked contractual foundation, violated Quantum's trade secret and confidential property protections, and attempted to circumvent Quantum's platform license rights.

91.    Eastgate and Pangea replaced Quantum in delivering the very services Roth was embedded in Quantum by Hollis to observe months earlier under the above stated material misrepresentations and material omissions.

92.    Roth now purports to work at or for Eastgate.

93.    Eastgate and Pangea closely mirror Quantum's operational model, membership systems, and platform workflows, supporting that Roth's October visit to Quantum was designed to misappropriate

Quantum trade secrets, confidential and proprietary property and methodologies. Roth, Palmer, Mize and Hollis have knowingly used Quantum's confidential information.

94.     Roth, Palmer, Mize and Hollis did not ask for Quantum's permission to use Quantum's Confidential Information, business practices, confidential and proprietary property and methodologies or compete against it nor did Quantum consent to Roth's, Mize's, Palmer's and Hollis' decision to do so.

95.     As a result, Roth, Palmer, Mize Hollis, Eastgate and Pangea profited at Quantum's expense. Quantum lost profits it had expected to make from several of its contractual and business relationships with GIOA and Quantum's pre-existing employees. Quantum also lost a customer with whom Palmer had relationships, along with its goodwill. As a result, Quantum has also lost profits it could have reasonably expected in the future.

96.     Despite notice of Quantum's objections, Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea have continued to use Quantum's non-trade secret confidential and proprietary information, business practices, and property, and have continued to benefit therefrom. As a result, these Defendants have clearly manifested their intent not to honor the confidentiality of Quantum's confidential and proprietary information and property, and to continue to violate all applicable laws unless ordered to comply by a court.

## COUNT ONE — BREACH OF FIDUCIARY DUTY

97.     Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs 1 through 96 herein.

98.     Quantum trusted the individual Defendants (Roth, Palmer, Smith, Hollis, and Mize) to protect and develop Quantum's business interests and act in the best interest of Quantum at all times. For these reasons, the individual Defendants were, whether formally or informally, fiduciaries to Quantum. They were, therefore, required to deal in the best of good faith with Quantum and to refrain from self-dealing. In sum, they owed a duty of utmost loyalty to Quantum.

99.     Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea acquired knowledge of Quantum's non-trade secret confidential information, business opportunities and advantages for Quantum under the PSA, and personal property through Roth's, Smith's, Hollis', Mize's and Palmer's employment, agency or relationship with GIOA, a relationship of trust which gave rise to a fiduciary duty of confidentiality; loyalty and utmost good faith; of candor; to refrain from self-dealing; to act with integrity of the strictest kind; of fair and honest dealing; and of full disclosure.

100.    Roth, Smith, Hollis, Mize and Palmer breached their fiduciary duty to Quantum by using, sharing and disseminating Quantum's non-trade secret confidential information, business opportunities and advantages for Quantum under the PSA,  business practices and personal property to Eastgate and Pangea without Plaintiff's written consent.

101.    Defendants violated Quantum's policies and used improper means to access Quantum's confidential information to take Quantum's proprietary information that does not qualify as trade secret information but still belongs exclusively to Quantum.

102.    The individual Defendants engaged in self-dealing and other conduct that was directly contrary to Quantum's interests by stealing Quantum's assets, intangible personal property, non-trade secret confidential information, business opportunities, and Quantum's employees. Thus, they breached their fiduciary duties by the conduct described above.

103.    Defendants Roth and Palmer also breached their fiduciary duty to Quantum by unlawfully competing against Quantum.

104.    Through improper action or wrongful conduct and without privilege, Eastgate and Pangea acted to procure a breach of Roth's, Smith's, Hollis', Mize's and Palmer's fiduciary duty to Quantum.

105.    Eastgate and Pangea were aware of Roth's, Smith's, Hollis', Mize's and Palmer's fiduciary duties to Quantum and participated in their fiduciary duty breaches.  Eastgate and Pangea are, therefore, a joint tort-feasor with Roth, Smith, Hollis, Mize, and/or Palmer.

106.    Roth's, Smith's, Hollis', Mize's and Palmer's breaches of their fiduciary duties, and Eastgate's and Pangea's participation in Roth's and Palmer's fiduciary duty breaches, injured Quantum and/or benefited them, and has resulted in damages or loss to Quantum.

## COUNT TWO — CONVERSION

107.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs 1 through 96 herein.

108.    Quantum is in the business of vendor management, membership administration and development, and funds management.

109.    Quantum has a competitive advantage over others in the same business because of the business opportunities and advantages for Quantum under the PSA, as well as in the course of business, where Quantum has gathered and created valuable non-trade secret confidential and proprietary information not generally known or readily available to the general public, as described above, including but not limited to, means and methods of operation and procedures.

110.    Defendants Roth, Palmer, Hollis, Eastgate and Pangea converted Quantum's non-trade secret confidential and proprietary information including the product, means, methods and work, business opportunities, and assets, in other words, these Defendants knowingly acquired, disclosed or used Quantum's non-trade secret confidential and proprietary information and personal property by improper means.

111.    Quantum owned, lawfully possessed and/or had a right to immediate possession of its non-trade secret confidential and proprietary information, business opportunities and advantages for Quantum under the PSA and personal property.

112.    Defendants wrongfully exercised dominion and control over Quantum's personal property.

113.    Defendants' wrongful acts proximately caused injury to Quantum and have resulted in damage or loss to Quantum.

114.    Quantum's injury resulted from Defendants' actions which showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of

conscious indifference to consequences and entitles Quantum to exemplary damages under O.C.G.A.

§ 51-12-5.1.

## COUNT THREE — TORTIOUS INTERFERENCE WITH CONTRACT

115.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs

1 through 96 herein.

116.    Quantum's PSA was a valid contract with GIOA.

117.    Defendants knew or had reason to know of Quantum's contract with GIOA and Quantum's

interest in the contract.

118.    Defendants willfully and intentionally interfered with Quantum's contract with GIOA.

119.    Defendants' interference proximately caused injury to Quantum, which resulted in damage or

loss to Quantum.

120.    Quantum's injury resulted from Defendants' actions which showed willful misconduct, malice,

fraud, wantonness, oppression, or that entire want of care which would raise the presumption of

conscious indifference to consequences which entitles Plaintiff to exemplary damages under O.C.G.A.

§ 51-12-5.1.

## COUNT FOUR — TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

121.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs

1 through 96 herein.

122.    Defendants interfered with Quantum's prospective business relationships with a number of its

pre-existing employees.  Quantum had ongoing business relationships with its pre-existing employees.

123.    Defendants knew of Quantum's prospective business relationships with these employees and

intentionally interfered with them.

124.    Defendants' actions were independently tortious or unlawful, regardless of the effect those

actions had on Quantum's prospective contracts or business relationships with its employees.

125.    Quantum suffered actual damage or loss because Defendants' interference prevented Quantum

from continuing Quantum's business relationships with its employees.

126.    Defendants' interference proximately caused injury to Quantum, which resulted in damage or loss.

127.    Quantum's injury resulted from Defendants' actions which showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences which entitles Plaintiff to exemplary damages under O.C.G.A. § 51-12-5.1.

## COUNT FIVE – CONSPIRACY

128.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs 1 through 96 herein.

129.    Defendants were members of a common conspiracy.  The object of the conspiracy was to accomplish an unlawful purpose: the theft, conversion and continuing misuse of Quantum's non-trade secret confidential and proprietary information, assets, business opportunities, and personal property. The object of the conspiracy included, but was not limited to:

    a.     fraudulently inducing and luring Plaintiff to disclose its non-trade secret confidential proprietary information and property in order for Defendants to convert or steal it, and profit thereby;

    b.     creating outside for-profit shell companies to financially profit from Defendants' relationships with other GIOA Operators, to personally enrich themselves or establish for-profit entities that would seize control of GIOA's operations to generate money for themselves and ultimately take over Quantum's role—not to better serve Operators, but to redirect the revenue streams and systems Quantum had built into privately controlled businesses; and

    c.     using shell companies to deprive Quantum of its PSA contract, and convert to their own use Quantum's revenues, staff, data, non-trade secret confidential proprietary information and property, and infrastructure and usurp Quantum's role providing Defendants with a direct financial interest in GIOA's operations.

130.    Defendants' scheme of knowing material misrepresentations and material omissions had the purpose and direct result of channeling contracts and business advantages to the Defendants and away from Plaintiff who had those contracts and business advantages, and would have continued to have them if Defendants had not undertaken their fraudulent conduct.

131.    Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea, in combination with each other, agreed to unlawfully interfere with Quantum's PSA with GIOA for the purpose of (1) causing Roth, Palmer and Hollis to disclose Quantum's, non-trade secret confidential proprietary information and property to Eastgate and Pangea without Quantum's consent; (2) causing employees to terminate their employment with Quantum; (3) causing Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea to misappropriate Quantum's non-trade secret confidential proprietary information and property; (4) causing Roth, Palmer, Smith, Hollis and Mize to breach their fiduciary duties to Quantum; (5) causing Roth, Palmer, Hollis, Eastgate and Pangea to convert or steal Quantum's non-trade secret confidential proprietary information and personal property; (6) interfering with Quantum's PSA contract with GIOA;  (7) interfering with Quantum's prospective relations with its employees; and (8) fraudulently increasing GIOA's income and the personal financial interests of Roth, Smith, Hollis, Mize, Palmer, Eastgate and Pangea.

132.    Defendants knew that the agreed acts would result in harm to Quantum.

133.    To accomplish the object of their agreement, Roth, Palmer, Mize, Eastgate and Pangea recruited other employees of Quantum and encouraged them to disclose Quantum's confidential proprietary information and compete against Quantum for their own use and benefit.

134.    Defendants proximately caused injury to Quantum and have resulted in damage or loss to Plaintiff.

## COUNT SIX – PUNITIVE DAMAGES

135.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs 1 through 96 herein.

136.    Defendants' actions, inactions, errors and omissions, in this case show willful misconduct, wantonness, oppression, and an entire want of care.

137.    Plaintiff is entitled to punitive damages based upon Defendants' tortious conduct.

## COUNT SEVEN – ATTORNEYS' FEES

138.    Quantum adopts and incorporates by reference the factual allegations contained in Paragraphs 1 through 96 herein.

139.    Defendants have acted in bad faith, have been stubbornly litigious, or have caused Plaintiff unnecessary trouble and expense.

140.    Defendants have adopted a "so sue me" attitude which authorizes the jury to award attorneys' fees and expenses. Buffalo Cab Co. v. Williams, 126 Ga. App. 522, 524-525, 191 S.E.2d 317 (1972).

141.    Pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to reasonable attorneys' fees and expenses of this litigation.

Plaintiff demands trial by jury.

WHEREFORE, Quantum respectfully requests that this Court award:

1. Judgment against Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea for breach of fiduciary duty;

2. Judgment against Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea for conversion;

3. Judgment against Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea for tortious interference with contract;

4. Judgment against Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea for tortious interference with prospective relations;

5. Judgment against Roth, Palmer, Smith, Hollis, Mize, Eastgate and Pangea for conspiracy;

6. All available damages associated with Defendants' actions;

7. Disgorgement of Defendants' profits gained from their illegal activity;

8. Exemplary damages;

9. Costs and attorneys' fees.

10. Pre-judgment and post-judgment interest as provided by law; and

11. Such further and necessary relief as the Court deems just and proper.

Respectfully submitted this  25th  day of July, 2025.


[signature on page below]


23

FREEMAN MATHIS & GARY, LLP

*/s/Jill R. Dunn*_____
Jill R. Dunn
Georgia Bar No. 602155
Steven D. Ginsburg
Georgia Bar No. 121055
jdunn@fmglaw.com
steven.ginsburg@fmglaw.com

*Attorneys for Plaintiff*

100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948
(770) 818-0000 (telephone)

# EXHIBIT 1A

# **Professional Services Agreement**

This PROFESSIONAL SERVICES AGREEMENT (this "**Agreement**") is entered into between *Quantum IQ, LLC* a Georgia corporation ("**WORLD**") & *Guardian Independent Operators Association* and *GIOA Benefits Trust Fund* (Collectively "**GIOA**") as of the effective date indicated below (the "**Effective Date**") subject to the terms and conditions set forth in Attachment 1, which are incorporated by reference into this Agreement as if fully set forth herein.

1. **Services; Statement of Work:**  WORLD agrees to provide to GIOA the services (the "**Services**") identified on one or more statements of work signed by the parties specifically referencing this Agreement (each, a "**Statement of Work**" or "**SOW**"). Each Statement of Work shall substantially conform to the initial SOW set forth in Attachment 2. Once the Statement of Work is signed by both parties it shall be incorporated herein by reference and made a part of this Agreement.

2. **Effective Date:** January 1, 2022

3. **Term:** This Agreement will begin on the Effective Date and remain in full force and effect for five (5) years (the "**Initial Term**"). Thereafter, this Agreement shall automatically renew for consecutive terms of five (5) year (each, a "**Renewal Term**") unless terminated by either party upon notice given at least ninety (90) days prior to the end of the Initial Term or the then-current Renewal Term.  The Initial Term, together with any and all Renewal Terms, is collectively referred to as the "**Term**." With respect to any Statement of Work entered into prior to the end of the Term, this Agreement shall continue in effect for the duration of such Statement of Work.

4. **Attachments:** The following attachments are set forth herein:
   i.   Attachment 1 - Terms & Conditions
   ii.  Exhibit 1A - Compensation, Carrier Credits, Commissions and Fees
   iii. Exhibit 1B – Business Associate Agreement
   iv.  Attachment 2 – Initial Statement of Work (SOW)

**ACKNOWLEDGED & AGREED as of the Effective Date:**

| **Quantum IQ, LLC** | **Guardian Independent Operators Association** |
|---|---|
| | **GIOA Benefits Trust Fund** |
| Signature: *John M. Drye* (DocuSigned by) | Signature: *Randy Smith* (DocuSigned by) |
| Print Name: John M. Drye | Print Name: Randy Smith |
| Print Title: CEO | Print Title: Executive Director |
| Date: 12/14/2021 | Date: 12/13/2021 |

# ATTACHMENT 1

## Professional Services Agreement

## TERMS AND CONDITIONS

These terms and conditions are attached to and made part of the Agreement. Capitalized terms not otherwise defined in this Attachment 1 shall have the respective meanings assigned to them on the signature page of this Agreement.

(1) **General Duties of WORLD:** WORLD shall perform the Services in conformance with the attached SOWs, all of which are incorporated herein, and in conformance with professional standards for performing services of a similar kind.  GIOA shall act as an executive BOARD or assign a representative ("GIOA's Representative") in relation to this Agreement and the Services, as named in SOWs, to provide direction to WORLD as necessary.  While WORLD is capable of acting in a professionally insurance licensed manor, it is not the intent of the parties hereto for WORLD to serve under its insurance license, but rather as an administrative services consultant and not in the capacity of offering insurance consultation unless specifically agreed to in writing by both WORLD and GIOA representatives.

(2) **Independent Consultant:**   In the performance of the Services hereunder, WORLD shall be deemed an independent contractor and not an employee of GIOA. WORLD is not an agent of GIOA, nor is it authorized to transact business, enter into agreements, or otherwise make commitments on behalf of GIOA, unless expressly authorized in writing by an officer of GIOA. GIOA will not pay or withhold federal, state, or local income tax or other payroll tax of any kind on behalf of WORLD or its employees. WORLD is responsible for the payment of all required payroll taxes, whether federal, state, or local in nature, including, but not limited to income taxes, Social Security taxes, Federal Unemployment Compensation taxes, and any other fees, charges, licenses, or payments required by law.

(3) **Indemnification**: Each Party shall indemnify, defend and hold harmless the other Party, its officers, employees, directors, Board Members, affiliated companies and agents from and against any and all third party claims, actions demands and lawsuits (together "causes of action") against the indemnified Party, and all resulting costs, liabilities, damages and expenses, including reasonable attorneys' fees and costs of suit arising out of: (a) The indemnifying Party's breach or violation of any representation, warranty or covenant in this Agreement, (b) The violation by a Party, in the performance of its obligations hereunder of any law, statute, rule, regulation or order of a governmental authority, or (c) The indemnifying Party's negligence or willful misconduct. However, GIOA will specifically indemnify WORLD for any Cause of Action brought against WORLD as a result of WORLD's compliance with a specific GIOA directive.

The obligations of indemnity hereunder are conditioned on the Party seeking indemnification (i) giving the indemnifying Party prompt written notice of any Cause of Action for which indemnification will be sought, (ii) permitting the indemnifying party to assume exclusively the control of the defense and settlement of such Claim, and (iii) providing reasonable assistance and cooperation (at the

indemnified Party's expense) in the defense and settlement of such Claim. The indemnified Party may take part in its defense at its own expense after the indemnifying Party assumes the control thereof. The indemnifying Party shall not settle or compromise any indemnified Cause of Action hereunder in a manner that admits fault or liability on the part of the indemnified Party, or requires the indemnified Party to take or forbear from taking any action, unless with the prior written consent of the indemnified Party (such consent not to be unreasonably withheld).

**(4) Confidential Information:**   Each party (for the purposes of this agreement, a "**Recipient**") shall maintain in strict confidence, and agrees not to disclose to any third party, except as necessary for the performance of this Agreement when authorized in writing by the other party (a "**Discloser**"), Confidential Information that Recipient receives from Discloser or Discloser's Affiliates. Notwithstanding the foregoing, Recipient may provide Confidential Information disclosed hereunder to its wholly owned subsidiaries and Affiliates pursuant to obligations of nondisclosure no less stringent than those contained in this Agreement.    "**Confidential Information**" means this Agreement; Discloser's trade secrets, as defined by applicable state law; and any other non-public information or material (whether in writing or retained as mental impressions) concerning Discloser or Discloser's Affiliates. The confidentiality provisions in this Article also apply to third parties' Confidential Information that Discloser provides to Recipient.

   a. **Exclusions.**  Confidential Information does not include information or material that (a) is or subsequently may come within the knowledge of the public generally through no fault of Recipient; (b) Recipient can show was previously known to it as a matter of record at the time of receipt; (c) Recipient may subsequently obtain lawfully from a third party who has lawfully obtained the information free of any confidentiality obligations; or (d) Recipient may subsequently develop as a matter of record, independently of disclosure by Discloser or Discloser's Affiliates.

   b. **Duration of Obligation.**   Recipient's confidentiality obligations with respect to Confidential Information shall remain in effect until five (5) years after the termination or expiration of this Agreement; provided that Recipient's obligations hereunder with respect to Confidential Information consisting of trade secrets shall remain in effect for as long as governing law allows.

   c. **Court Order.**   Notwithstanding the foregoing restrictions, Recipient may disclose Confidential Information to the extent required by an order of any court or other Governmental Authority, but only after Recipient has notified Discloser and Discloser has had the opportunity, if possible, to obtain reasonable protection for such Confidential Information in connection with such disclosure.

   d. **Retention**.   Recipient shall not retain Confidential Information any longer than is reasonably necessary to accomplish the intended purposes for which it was disclosed. Upon the earlier termination of this Agreement or the written request of Discloser, Recipient shall delete or destroy all of Discloser's Confidential Information in Recipient's possession, including any copies of it, and shall deliver a written statement to Discloser within fifteen (15) days of Discloser's request confirming that Recipient has done so.

   e. **PII and PHI  –** Confidential information in the form of PII (Personally Identifiable Information) of PHI (Protected Health Information) shall be additionally governed by the Exhibit 1(B) under a Business Associate Agreement.

(5) **Licenses**: If a license of any kind is required of either party, its employees, agents, or sub agents by Federal or State law, each party warrants that such license has been or will be obtained, is valid and in good standing, that each party is exclusively responsible to keep it in effect at all times during the terms of this Agreement, and that any applicable bond has been posted in accordance with all applicable laws and regulations.

(6) **No Legal Advice:** GIOA certifies that WORLD may from time-to-time comment, review legal or compliance related documents, legal matters, or provide business opinions by lawyers under WORLD employ or direction in a non-legal advice fashion. Such advice is not intended to be legal advice unless specifically indicated as such in writing.  GIOA may not and should not rely on any such advice as legal advice and acknowledges that it will in all circumstances consult its own legal advisors.  Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, GIOA acknowledges that any U.S. federal tax advice contained in any communication (including any attachments) provided by WORLD is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

(7) **Aggregate Liability** - The aggregate liability of WORLD to GIOA for any and all losses arising out of or relating to the provision of this Professional Services Agreement, any accompanying SOW or the performance of WORLD's other obligations shall not exceed the amount of ongoing compensation paid on account of the Services giving rise to such loss for the twelve-month period immediately preceding the events causing any loss. WORLD shall have no liability for the acts or omissions of any third party. The provisions of this Section 7 shall apply to the fullest extent permitted by law.

(8) **Compensation, Carrier Credits, Commissions and Fees**: All compensation, fees or funds at the direction of WORLD shall be initially outlined in this agreement in Exhibit 1 (A).  Based on future requests for services to be performed, any additional compensation, carrier credits, commissions or fees (ie: Collective compensation) may be incorporated via a mutually executed Statement of Work (SOW).

(9) **Term and Termination:**  The term of the agreement, as referenced in the *Professional Services Agreement*, shall commence on the Effective Date and continue in effect for the Term specified on the signature page of this agreement:

   a.  <u>Breach</u>: In addition to any other remedy available under this Agreement or otherwise, either party may terminate this Agreement (or any Statement of Work) if the other party breaches any material provision of this Agreement (or the applicable Statement of Work) and has not cured the breach within thirty (30) days after receipt of written notice of the breach from the non-breaching party where it was possible to cure such breach in the allotted time frame.

   b.  <u>Termination without Cause</u> (Convenience).  GIOA may terminate this Agreement (or any Statement of Work) at any time without cause, or for convenience, effective ninety (90) days after WORLD's receipt of written notice from GIOA.  However, all Compensation,

Fees and Commissions payable during the entire term shall remain due and payable for the duration of the current Term. Such collective compensation shall be deemed "Termination Period Compensation" and shall continue to be paid on the then current timeline for how compensation is calculated and paid during the term.

WORLD may terminate this Agreement (or any Statement of Work) at any time without cause and for convenience effective ninety (90) days after GIOA's receipt of written notice from WORLD.  IF WORLD is the terminating party, all collective compensation shall terminate at the end of the notice period.

c.   **Cooperation after Termination.**  During any period after which notice of termination has been given by either party under this Article, each party shall continue to fulfill its respective obligations under this Agreement, unless otherwise prohibited by law, and shall cooperate in the orderly wind-down of the parties' performance of this Agreement, including the orderly transition of the Services to any party designated by GIOA.

**(10)    Compliance:** As applicable to each party's respective obligations under the Agreement, and notwithstanding anything to the contrary in this Agreement, each party shall comply with and cause each of its employees, agents Board Members, Executive Director and Subcontractors to comply with, Applicable Laws, and shall obtain all licenses, permits, permissions and consents which may be required of it by any Governmental Authority.  "Applicable Laws" means all federal, foreign, provincial, state and local laws, statutes, regulations, rules, executive orders, supervisory requirements, directives, interpretive letters and other official releases of any Governmental Authority applicable to such party, in each case as amended, consolidated, supplemented or replaced from time to time.  "Governmental Authority" means any federal, provincial, state and local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, bureau or entity or any arbitrator with authority to bind WORLD or GIOA at law.

**(11)    NOT an Administrator or Fiduciary**: GIOA expressly acknowledges that the services and consultation provided by WORLD, or any of our affiliates or subcontractors, does in no way make or constitute making WORLD an "administrator" within the meaning under applicable law, including the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Further except as may be specifically agreed upon in any SOW (Statement of Work), neither we nor any of our affiliates or subcontractors is a "fiduciary" within the meaning under applicable law or ERISA, unless provided otherwise herein or required by applicable law.  The responsibilities of Administrator and Fiduciary shall remain exclusively with the Board of Trustees of the GIOA Benefit Trust Fund.

**(12)    FORCE MAJEURE:** Neither party will be liable to the other party, nor be deemed to be in default of this Agreement because of, any failure or delay in its performance due under this Agreement not occasioned by or based upon the fault or negligence of the party claiming relief under this Section and caused by unforeseeable acts of God, fire, floods, industry-wide strikes, work-to-rule actions, go-slows or similar labor difficulties, unavailability of equipment, materials, or services, due to industry-wide shortages, terrorist acts, wars, actions by a Governmental

Authority, or any other similar, unforeseeable cause beyond a party's reasonable control (collectively, "Force Majeure Events"), provided that the party seeking to delay its performance gives the other written notice of any such Force Majeure Event as soon as practicable after the discovery, and further provided that such party uses its good faith efforts to overcome the Force Majeure Event (and, in any event, such party will begin or resume performance as soon as practicable after the Force Majeure Event has abated).  The following is a non-exclusive list of circumstances that are not Force Majeure Events: (a) economic hardship; (b) changes in market conditions; and (c) insufficiency of funds.  The parties agree that Force Majeure Events shall not excuse any payment due from one party to the other.

**(13)** **Notices:**  Any notices, requests or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, by overnight courier, or by facsimile transmission ("fax"), or mailed by United States registered or certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party at its address or to its fax number, as appropriate, as set forth:

> **GIOA:**   Attention Executive Director (or any Executive Board Member)
> Executive Director or Executive Board Member's address on File for GIOA Benefits
>
> With a copy to:
>
> Rob Breunig (GIOA Legal Counsel)
> **Adams and Reese LLP**
> 424 Church Street, Suite 2700
> Nashville, TN 37219
> FAX: 615-259-1470
>
>
> **Quantum IQ, LLC:**     Attention Legal Counsel
>
> 2 Ravinia Dr. Suite 1500
> Atlanta, GA 30346
> Fax: 770-394-0333

Any such notice, request, or other communication shall be considered given on the date of hand or courier delivery if delivered by hand or overnight courier, on the date of transmission, as shown by confirmation of transmission if delivered by fax, or on the third day following the date of deposit in the United States mail as provided above.  Rejection or other refusal to accept or inability to deliver because of changed address or fax number of which no notice was given shall not affect the validity or the effectiveness of the notice, request or other communication.  Either party may change its address or fax number for notice purposes upon issuance of notice thereof in accordance with this Section.

**(14)** **Subcontractors:  WORLD** shall be entitled to subcontract any work deemed necessary to sub-contractors to fulfill its obligations in any SOW so long as it is disclosed to GIOA.  WORLD shall initially elect to subcontract certain services to World Insurance Association, Inc. and World Insurance Association Consulting Gorup, LLC

**(15)**    **General Provisions:**

a.  **Interpretation:**  Interpretation of this Agreement shall be governed by the following rules of construction:  (a) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires; (b) the word "including" and words of similar import shall mean "including, without limitation"; (c) the headings contained herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (d) references to "days" or a "day" shall mean a calendar day, unless otherwise stated; and (e) as this Agreement is the product of negotiations between the parties and their respective counsel, no provision or section of this Agreement shall be construed against either party by reason of ambiguity of language, rule of construction against the draftsman, or similar doctrine.

b.  **Dispute Resolution:** If there is any dispute or controversy between the parties arising out of or relating to this Agreement, the parties agree that such dispute or controversy will first be handled with an in-person meeting of senior management or (Executive board) within 60 days of written request by one party and then be arbitrated in accordance with proceedings under American Arbitration Association (AAA) rules, and such arbitration will be the exclusive dispute resolution method under this Agreement. The decision and award determined by such arbitration will be final and binding upon both parties. All costs and expenses, including reasonable attorney's fees and expert's fees, of all parties incurred in any dispute that is determined and/or settled by arbitration pursuant to this Agreement will be borne by the party determined to be liable in respect of such dispute; provided, however, that if complete liability is not assessed against only one party, the parties will share the total costs in proportion to their respective amounts of liability so determined. Except where clearly prevented by the area in dispute, both parties agree to continue performing their respective obligations under this Agreement until the dispute is resolved.

c.  **Governing Law:**  All matters arising from or relating to this Agreement shall be governed by and construed in accordance with the laws of the state of Georgia, United States of America, without giving effect to any choice-of-law provision or rule (whether of the state of Georgia or any other jurisdiction) that would cause the application of the laws of any other jurisdiction.  Fulton County, Georgia shall be the sole venue location for any dispute or AAA Arbitration.

d.  **Successors and Assigns; No Third-Party Beneficiaries.**  This Agreement is legally binding upon and inures to the benefit of the parties and their permitted successors and assigns. No third party is intended to benefit from, nor may any third party seek to enforce, any of the terms of this Agreement.

e.  **Relationship of the Parties.**  Nothing contained in this Agreement shall be deemed to create an association, partnership, joint venture, or relationship of principal and agent or master and servant between the parties, or to grant either party the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of, or on behalf of, the other party.

f.  **Complete Agreement:**  This Agreement, together with all Exhibits, Attachments and signed Statements of Work hereto, constitutes the complete agreement between the parties and supersedes all prior or contemporaneous agreements and understandings between the parties with respect to the subject matter hereof.  In entering into this Agreement, neither party has relied upon any statement, representation, warranty, or agreement by or from the other party except for those expressly contained in this Agreement.

g.  **Modification:**  The terms of this Agreement may not be modified or amended other than by a writing executed by both parties by their duly authorized representatives that specifically identifies this Agreement.

h.  **Precedence:**  In the event of conflict or inconsistency between the provisions of this Agreement and those of any Exhibit, Attachment or Statement of Work, the order of precedence set forth in this Section shall apply, with the first document listed below having the highest precedence and the last document listed below having the lowest precedence:

- Professional Services Agreement Terms and Conditions, together with all of the Exhibits
- Statement of Work

In the event of any conflict between the terms of this Agreement and the terms of any purchase order, invoice, quote, ordering document, proposal or transaction document, or any other similar documentation issued in connection with the transactions contemplated under this Agreement, the terms of this Agreement shall govern and control.

i.  **Waiver:**  The failure of either party to enforce any of the provisions of this Agreement, or to exercise any option provided in this Agreement, or to require performance by the other party of any of the provisions in this Agreement, is not a present or future waiver of such provisions and does not affect the validity of this Agreement or the right of such party to enforce each and every provision of this Agreement thereafter.  The express waiver (whether one or more times) by a party of any provision, condition or requirement of this Agreement does not constitute a waiver of any future obligation of the other party to comply with such provision, condition or requirement. No waiver of any provision of this Agreement shall be effective unless in writing.

j.  **Remedies Cumulative**:  Except as specifically set forth in this Agreement, the rights and remedies set forth in this Agreement are cumulative and are not intended to be exhaustive.  A party's cure of any failure to perform under this Agreement does not excuse liability for any delays or other damages the non-defaulting party may have incurred resulting from such failure.

k.  **Severability:**  If any provision of this Agreement is determined to be invalid, illegal or unenforceable, such provision shall be deemed to have been deleted from this Agreement, while the remaining provisions of this Agreement remain in full force and

effect if the essential terms and conditions of this Agreement for each party remain valid, binding and enforceable.

l.  **Counterparts & Electronic Signatures:**  This Agreement may be executed in one or more counterparts, each of which is deemed an original and all of which, taken together, constitutes a single enforceable agreement. Signatures may be electronic or handwritten, each being of equal effect.

m.  <u>**Attachments and Exhibits**</u>. Every Exhibit and Attachment to this Agreement is an integral part of this Agreement and is incorporated into this Agreement, and each reference to the "Agreement" shall include the following:

- <u>Attachment 1</u>        Professional Services Agreement
  Terms and Conditions

   - o   Exhibit 1A        Compensation /Credit Management
   - o   Exhibit 1B        BAA (Business Associate Agreement)

- <u>Attachment 2</u>        Initial Statement of Work & Change Order Template


Later exhibits, attachments, Statements of Work (Sow) or amendments to this Agreement may, by written agreement of the parties, be incorporated into this Agreement by a reference to this Agreement made in such exhibit, attachment or amendment.

*Signatures on First Page of Agreement*

*The rest of this page left intentionally blank*

# Professional Services Agreement – Exhibit 1A

### Compensation /Credit Management

(1) **Definitions**:
    *a.* Commissions (<u>Insurance</u> activity related),
    *b.* Fees (<u>Administration</u> activity related) and
    *c.* Dues (<u>Membership</u> payments exclusively for GIOA)
    *d.* Credits (Carrier Financial contribution) to cover administration, membership or technology expenses GIOA may have.

(2) **Consolidated Fee** - Compensation for WORLD shall be paid through a *Consolidated GIOA FEE* that shall be established and paid through the Chic-Fil-A *Fee Calculation Report* ("FCR").

(3) **PEPM Basis** - Such Consolidated GIOA FEE shall be collected on a "PEPM" (Per Employee Per Month) basis on the entire GIOA membership (both Affinity and Association Health Plan population) at each Owner/Operator store and not just those individual members eligible for or that select benefits.

(4) **Start Date** - Starting with GIOA Operator FCR payments for January 2022 the "Consolidated GIOA Fee" shall be broken down as follows:

    a. **GIOA Consolidated Administration (Admin) Fee** (Total = $2.50 PEPM on all members)
        i. .85 (Eighty-five cents) for Unify HR
        ii. ZERO for Health Advocate (It is anticipated that the Health Advocate PMPM will end in 2022)
        iii. $1.25 (One Dollar Twenty-five cents) for GIOA Benefits Team (WORLD) + 3% annual Escalator increase
        iv. .25 (Twenty-five cents) for GIOA Reserve Fund
        v. .15 (Fifteen cents) (GIOA excess reserve fund) * anticipated to help cover 3% escalator for WORLD in future years
    b. **WORLD Escalator Increase** – a 3% (three) annual escalator increase shall be factored into WORLD compensation by example:
        i. **Year 1 (2022)** - $1.25 PMPM
        ii. **Year 2 (2023)** - $1.29 PMPM
        iii. **Year 3 (2024) -** $1.33 PMPM
        iv. **Year 4 (2025)** - $1.37 PMPM
        v. **Year 5 (2026)** - $1.41 PMPM
        vi. Increasing annually 3% forward unless both parties agree to another escalator**.**

**Compensation & Fee/Credit Management**

(5) **Carrier Credits** - WORLD shall be charged with managing all Carrier Credits for usage of technology and administrative costs (full disclosure) to grow membership with a new membership department (conventions, mailings, technology, administration, Board Meetings etc..).

    a.   Carrier Credits shall be a funding source for the New Membership Department exclusively. Currently Anthem and Securian are contributing carrier credits.

    b.   Full disclosure of how carrier credits are spent shall be provided to GIOA on no less than a Semi-Annual basis.

    c.   GIOA shall have veto power over any expense exceeding $5,000 annually that it wishes to be directed elsewhere for membership growth.

(6) **Extraordinary/Unanticipated Expense** – WORLD reserves right to discuss any GIOA request that will exceed the list of responsibilities in the initial SOW for additional compensation, expense, resources or support.

# EXHIBIT 1B

## Professional Services Agreement
Exhibit 1B

**BUSINESS ASSOCIATE AGREEMENT**

**Covered Entity:**

**GIOA Benefit Trust Fund**
780 Buford HWY
Building A Suite 101
Suwanee, GA 30024

This Business Associate Agreement is entered into as of the ***Covered Entity Execution Date*** listed above, by and between the ***Covered Entity*** listed above ("Entity"); Guardian Independent Operator Association, Inc. (the "Association"), a Georgia nonprofit corporation, in its capacity as sponsor of the Covered Entity; and Quantum IQ, LLC located at 2 Ravinia Drive, Suite 1500 Atlanta, GA 30346 (the "Business Associate").

**WITNESSETH:**

**WHEREAS**, the Association previously has entered into an agreement (the "Agreement") with the Business Associate, whereby the Business Associate has agreed to provide certain services to the Association;

**WHEREAS,** to provide such services to the Association, the Business Associate must have access to certain protected health information ("Protected Health Information" or "PHI"), including PHI from the Entity, as defined in the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Standards") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996, ("HIPAA") and amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), part of the American Recovery and Reinvestment Act of 2009 ("ARRA"), the Genetic Information Nondiscrimination Act of 2008 ("GINA"), and the final regulations to such Acts promulgated in January 2013;

**WHEREAS,** to comply with the requirements of the Privacy Standards, the Covered Entity must enter into this Business Associate Agreement with the Business Associate.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**I.    Definitions**

The following terms used in this Agreement shall have the same meaning as those terms in the Privacy Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Secretary, Subcontractor, and Use.  If other terms are used, but not otherwise defined under this Business Associate Agreement, such terms shall then have the same meaning as those terms in the Privacy Rule.

***Business Associate***. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103.

***Covered Electronic Transactions.*** "Covered Electronic Transactions" shall have the meaning given the term "transaction"" in 45 CFR §160.103.

**(c)** ***Covered Entity***. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103.

**d** ***Electronic Protected Health Information.*** "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR §160.103.

***Genetic Information***. "Genetic Information" shall have the same meaning as the term "genetic information" in 45 CFR §160.103.

***HIPAA Rules.*** "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

**(g)** ***Individual.*** "Individual" shall have the same meaning as the term "individual" in 45 CFR §160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR §164.502(g).

***Privacy Rule.*** "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, subparts A and E.

***Protected Health Information (PHI).*** "Protected Health Information (PHI)" shall have the same meaning as the term "protected health information" in 45 CFR §160.103, limited to the information created or received by Business Associate from or on behalf of a Covered Entity pursuant to this Agreement.

**(j)** ***Required By Law.*** "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR §164.103.

**(k)** ***Secretary.*** "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

***Standards for Electronic Transactions Rule.*** "Standards for Electronic Transactions Rule" means the final regulations issued by HHS concerning standard transactions and code sets under the Administration Simplification provisions of HIPAA, 45 CFR Part 160 and Part 162.

**(m)** ***Security Incident.*** "Security Incident" shall have the same meaning as the term "security incident" in 45 CFR §164.304.

**(n)** ***Security Rule.*** "Security Rule" shall mean the Security Standards and Implementation Specifications at 45 CFR Part 160 and Part 164, subpart C.

**(o)** ***Subcontractor.*** "Subcontractor" shall have the same meaning as the term subcontractor in 45 CFR §160.103.

***Transaction.*** "Transaction" shall have the meaning given the term "transaction" in 45 CFR §160.103

***Unsecured Protected Health Information.*** "Unsecured Protected Health Information" shall have the meaning given the term "unsecured protected health information" in 45 CFR §164.402.

## II.  Safeguarding Privacy and Security of Protected Health Information

**(a)  *Permitted Uses and Disclosures.*** The Business Associate is permitted to use and disclose Protected Health Information that it creates or receives on the Covered Entity's behalf or receives from the Covered Entity (or another business associate of the Covered Entity) and to request Protected Health Information on the Covered Entity's behalf (collectively, "Covered Entity's Protected Health Information") only:

**(i)  Functions and Activities on** the **Covered Entity's Behalf.** To perform those services referred in the attached services agreement.

**(ii)  Business Associate's Operations.** For the Business Associate's proper management and administration or to carry out the Business Associate's legal responsibilities, provided that, with respect to disclosure of the Covered Entity's Protected Health Information, either:

(A)  The disclosure is Required by Law; or

(B)  The Business Associate obtains reasonable assurance from any person or entity to which the Business Associate will disclose the Covered Entity's Protected Health Information that the person or entity will:

(1)  Hold the Covered Entity's Protected Health Information in confidence and use or further disclose the Covered Entity's Protected Health Information only for the purpose for which the Business Associate disclosed the Covered Entity's Protected Health Information to the person or entity or as Required by Law; and

(2)  Promptly notify the Business Associate (who will in turn notify the Covered Entity in accordance with the breach notification provisions) of any instance of which the person or entity becomes aware in which the confidentiality of the Covered Entity's Protected Health Information was breached.

(C)  To de-identify the information in accordance with 45 CFR 164.514(a) – (c) as necessary to perform those services required under the Agreement.

**(iii) Minimum Necessary.** The Business Associate will, in its performance of the functions, activities, services, and operations specified above, make reasonable efforts to use, to disclose, and to request only the minimum amount of the Covered Entity's Protected Health Information reasonably necessary to accomplish the intended purpose of the use, disclosure or request, except that the Business Associate will not be obligated to comply with this minimum-necessary limitation if neither the Business Associate nor the Covered Entity is required to limit its use, disclosure or request to the minimum necessary. The Business Associate and the Covered Entity acknowledge that the phrase "minimum necessary" shall be interpreted in accordance with the HITECH Act.

**(b)** *Prohibition on Unauthorized Use or Disclosure.* The Business Associate will neither use nor disclose the Covered Entity's Protected Health Information, except as permitted or required by this Agreement or in writing by the Covered Entity or as Required by Law. This Agreement does not authorize the Business Associate to use or disclose the Covered Entity's Protected Health Information in a manner that will violate Subpart E of 45 CFR Part 164 if done by the Covered Entity.

**(c)** *Information Safeguards.*

**(i)** **Privacy of** the **Covered Entity's Protected Health Information.** The Business Associate will develop, implement, maintain, and use appropriate administrative, technical, and physical safeguards to protect the privacy of the Covered Entity's Protected Health Information. The safeguards must reasonably protect the Covered Entity's Protected Health Information from any intentional or unintentional use or disclosure in violation of the Privacy Rule and limit incidental uses or disclosures made to a use or disclosure otherwise permitted by this Agreement.

**(ii)** **Security of** the **Covered Entity's Electronic Protected Health Information.** The Business Associate will develop, implement, maintain, and use administrative, technical, and physical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information that the Business Associate creates, receives, maintains, or transmits on the Covered Entity's behalf as required by the Security Rule.   The Business Associate with comply with Subpart C of 45 CFR Part 164 with respect to Electronic Protected Health Information,  to prevent use or disclosure of protected health information other than as provided for by the Agreement.

**(iii)** **No Transfer of PHI Outside United States.** Business Associate will not transfer Protected Health Information outside the United States without the prior written consent of the Covered Entity. In this context, a "transfer" outside the United States occurs if Business Associate's non-information technology workforce members, agents, or subcontractors physically located outside the United States are able to access, use, or disclose Protected Health Information.

**(iv)** **Policies and Procedures.** The Business Associate shall maintain written policies and procedures, conduct a risk analysis, and train and discipline of its workforce.

**(d)** *Subcontractors and Agents.* In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, the Business Associate will ensure that any of its Subcontractors and agents that create, receive, maintain, or transmit Protected Health information on behalf of the Business Associate agree to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information.

**(e)** *Prohibition on Sale of Records.* As of the effective date specified by HHS in final regulations to be issued on this topic, the Business Associate shall not directly or indirectly receive remuneration in exchange for any Protected Health Information of an individual unless the Covered Entity or Business Associate obtained from the individual, in accordance with 45 CFR §164.508, a valid authorization that includes a specification of whether the Protected Health Information can be further exchanged for remuneration by the entity receiving Protected Health Information of that individual, except as otherwise allowed under the HITECH Act.

**(f) Prohibition on Use or Disclosure of Genetic Information.** Business Associate shall not use or disclose Genetic Information for underwriting purposes in violation of the HIPAA rules.

**(g) Penalties For Noncompliance. The Business Associate acknowledges that it is subject to** civil and criminal enforcement for failure to comply with the privacy rule and security rule under the HIPAA Rules, as amended by the HITECH Act.

## III. Compliance with Electronic Transactions Rule

If the Business Associate conducts in whole or part Electronic Transactions on behalf of the Covered Entity for which HHS has established standards, the Business Associate will comply, and will require any Subcontractor or agent it involves with the conduct of such Transactions to comply, with each applicable requirement of the Electronic Transactions Rule. The Business Associate shall also comply with the National Provider Identifier requirements, if and to the extent applicable.

## IV. Obligations of the Covered Entity

The Covered Entity shall notify the Business Associate of:

(a) Any limitation(s) in its notice of privacy practices of the Covered Entity in accordance with 45 CFR §164.520, to the extent that such limitation may affect the Business Associate's use or disclosure of Protected Health Information;

(b) Any changes in, or revocation of, permission by the Individual to use or disclose Protected Health Information, to the extent that such changes may affect the Business Associate's use or disclosure of Protected Health Information; and

(c) Any restriction to the use or disclosure of Protected Health Information that the Covered Entity has agreed to in accordance with 45 CFR §164.522, to the extent that such restriction may affect the Business Associate's use or disclosure of Protected Health Information.

## V. Permissible Requests by the Covered Entity

The Covered Entity shall not request the Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by the Covered Entity.

## VI. Individual Rights

**(a) *Access.*** The Business Associate will, within twenty-five (25) calendar days following the Covered Entity's request, make available to the Covered Entity or, at the Covered Entity's direction, to an individual (or the individual's personal representative) for inspection and obtaining copies of the Covered Entity's Protected Health Information about the individual that is in the Business Associate's custody or control, so that the Covered Entity may meet its access obligations under 45 CFR §164.524. Effective as of the date specified by HHS, if the Protected Health Information is held electronically in a designated record Set in the Business Associate's custody or control. Business Associate will provide an electronic copy in the form and format specified by the Covered Entity if it is readily producible in such form. The Business Associate will provide an electronic copy in the form and format specified by the Covered Entity if it is readily producible in such format; if it not readily producible in such format, the Business Associate will work with

the Covered Entity to determine an alternative form and format as specified by the Covered Entity to meet its electronic access obligations under 45 CFR 164.524.

**(b)** *Amendment.* The Business Associate will, upon receipt of written notice from the Covered Entity, promptly amend or permit the Covered Entity access to amend any portion of the Covered Entity's Protected Health Information in a designated record set as directed or agreed to by the Covered Entity, so that the Covered Entity may meet its amendment obligations under 45 CFR §164.526.

**(c)** *Disclosure Accounting.* The Business Associate will maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy the Covered Entity's obligations under 45 CFR §164.528.

**(i)  Disclosures Subject to Accounting.** The Business Associate will record the information specified below ("Disclosure Information") for each disclosure of the Covered Entity's Protected Health Information, not excepted from disclosure accounting as specified below, that the Business Associate makes to the Covered Entity or to a third party.

**(ii)  Disclosures Not Subject to Accounting.** The Business Associate will not be obligated to record Disclosure Information or otherwise account for disclosures of the Covered Entity's Protected Health Information if the Covered Entity need not account for such disclosures under the HIPAA Rules.

**(iii) Disclosure Information.** With respect to any disclosure by the Business Associate of the Covered Entity's Protected Health Information that is not excepted from disclosure accounting under the HIPAA Rules, the Business Associate will record the following Disclosure Information as applicable to the type of accountable disclosure made:

**(A) Disclosure Information Generally.** Except for repetitive disclosures of the Covered Entity's Protected Health Information as specified below, the Disclosure Information that the Business Associate must record for each accountable disclosure is (1) the disclosure date, (2) the name and (if known) address of the entity to which the Business Associate made the disclosure, (3) a brief description of the Covered Entity's Protected Health Information disclosed, and (4) a brief statement of the purpose of the disclosure.

**(B) Disclosure Information for Repetitive Disclosures.** For repetitive disclosures of the Covered Entity's Protected Health Information that the Business Associate makes for a single purpose to the same person or entity (including the Covered Entity), the Disclosure Information that the Business Associate must record is either the Disclosure Information specified above for each accountable disclosure, or (1) the Disclosure Information specified above for the first of the repetitive accountable disclosures; (2) the frequency, periodicity, or number of the repetitive accountable disclosures; and (3) the date of the last of the repetitive accountable disclosures.

**(iv)  Availability of Disclosure Information.** The Business Associate will maintain the Disclosure Information for at least 6 years following the date of the accountable disclosure to which the Disclosure Information relates (3 years for disclosures related to an Electronic Health Record, starting with the date specified by HHS). The Business Associate will make the Disclosure Information available to the Covered Entity within fifty (50) calendar days following the Covered Entity's request for such Disclosure Information to comply with an individual's request for disclosure

accounting. Effective as of the date specified by HHS, with respect to disclosures related to an Electronic Health Record, the Business Associate shall provide the accounting directly to an individual making such a disclosure request, if a direct response is requested by the individual.   To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the covered entity in the performance of such obligation(s); and make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**(d)** *Restriction Agreements and Confidential Communications.* The Covered Entity shall notify the Business Associate of any limitations in the notice of privacy practices of Covered Entity under 45 CFR §164.520, to the extent that such limitation may affect the Business Associate's use or disclosure of Protected Health Information. The Business Associate will comply with any agreement that the Covered Entity makes that either (i) restricts use or disclosure of the Covered Entity's Protected Health Information pursuant to 45 CFR §164.522(a), or (ii) requires confidential communication about the Covered Entity's Protected Health Information pursuant to 45 CFR §164.522(b), provided that the Covered Entity notifies the Business Associate in writing of the restriction or confidential communication obligations that the Business Associate must follow. The Covered Entity will promptly notify the Business Associate in writing of the termination of any such restriction agreement or confidential communication requirement and, with respect to termination of any such restriction agreement, instruct the Business Associate whether any of the Covered Entity's Protected Health Information will remain subject to the terms of the restriction agreement. Effective February 17, 2010 (or such other date specified as the effective date by HHS), the Business Associate will comply with any restriction request if: (i) except as otherwise required by law, the disclosure is to a health plan for purposes of carrying out payment or health care operations (and is not for purposes of carrying out treatment); and (ii) the Protected Health Information pertains solely to a health care item or service for which the health care provider involved has been paid out-of-pocket in full.

### VII. Breaches and Security Incidents

**(a)** *Reporting*

**(i)**      **Impermissible Use or Disclosure.** The Business Associate will report to Covered Entity any use or disclosure of Protected Health Information not permitted by this Agreement not more than fifty (50) calendar days after Business Associate becomes aware of such non-permitted use or disclosure.

**(ii)**      **Privacy or Security Breach.** The Business Associate will report to the Covered Entity any use or disclosure of the Covered Entity's Protected Health Information not permitted by this Agreement of which it becomes aware, including breaches of Unsecured Protected Health Information as required by 45 CFR 164.40, and any Security Incident of which it becomes aware.  The Business Associate will make the report to the Covered Entity's Privacy Official not more than fifty (50) calendar days after the Business Associate becomes aware of such non-permitted use or disclosure. If a delay is requested by a law-enforcement official in accordance with 45 CFR §164.412, the Business Associate may delay notifying the Covered Entity for the applicable time period. The Business Associate's report will at least:

(A) Identify the nature of the Breach or other non-permitted use or disclosure, which will include a brief description of what happened, including the date of any Breach and the date of the discovery of the Breach;

(B) Identify the Covered Entity's Protected Health Information that was subject to the non-permitted use or disclosure or Breach (such as whether full name, social security number, date of birth, home address, account number or other information were involved) on an individual basis;

(C) Identify who made the non-permitted use or disclosure and who received the non-permitted use or disclosure;

(D) Identify what corrective or investigational action the Business Associate took or will take to prevent further non-permitted uses or disclosures, to mitigate harmful effects and to protect against any further Breaches;

(E) Identify what steps the individuals who were subject to a Breach should take to protect themselves; and

(F) Provide such other information, including a written report and risk assessment under 45 CFR §164.402, as the Covered Entity may reasonably request.

**(iii)    Security Incidents.** The Business Associate will report to the Covered Entity any Security Incident of which the Business Associate becomes aware. The Business Associate will make this report once per month, except if any such Security Incident resulted in a disclosure not permitted by this Agreement or Breach of Unsecured Protected Health Information, Business Associate will make the report in accordance with the provisions set forth above.

***(b) Mitigation.*** The Business Associate shall mitigate, to the extent practicable, any harmful effect known to the Business Associate resulting from a use or disclosure in violation of this Agreement.

## VIII. Term and Termination

**(a)    *Term.*** The term of this Agreement shall be effective as of as of the date specified above, and shall terminate when all Protected Health Information provided by the Covered Entity to the Business Associate, or created or received by the Business Associate on behalf of the Covered Entity, is destroyed or returned to the Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this section.

**(b)*Right to Terminate for Cause.*** The Covered Entity may terminate this Agreement if it determines, in its sole discretion that the Business Associate has breached a material term of this Agreement, and upon written notice to the Business Associate of the breach, the Business Associate fails to cure the breach within thirty (30) calendar days after receipt of the notice. Any such termination will be effective immediately or at such other date specified in the Covered Entity's notice of termination.

***(c)        Treatment of Protected Health Information on Termination.***

**(i)  Return or Destruction of Covered Entity's Protected Health Information as Feasible.**

Upon termination or other conclusion of this Agreement, the Business Associate will, if feasible, return to the Covered Entity or destroy all of the Covered Entity's Protected Health Information in whatever form or medium, including all copies thereof and all data, compilations, and other works derived therefrom that allow identification of any individual who is a subject of the Covered Entity's Protected Health Information. This provision shall apply to Protected Health Information that is in the possession of Subcontractors or agents of the Business Associate. Further, the Business Associate shall require any such Subcontractor or agent to certify to the Business Associate that it returned to the Business Associate (so that the Business Associate may return it to the Covered Entity) or destroyed all such information which could be returned or destroyed. The Business Associate will complete these obligations as promptly as possible, but not later than thirty (30) calendar days following the effective date of the termination or other conclusion of this Agreement.

**(ii)  Procedure When Return or Destruction Is Not Feasible.** The Business Associate will identify any of the Covered Entity's Protected Health Information, including any that the Business Associate has disclosed to subcontractors or agents as permitted under this Agreement, that cannot feasibly be returned to the Covered Entity or destroyed and explain why return or destruction is infeasible. The Business Associate will limit its further use or disclosure of such information to those purposes that make return or destruction of such information infeasible. The Business Associate will complete these obligations as promptly as possible, but not later than thirty (30) calendar days following the effective date of the termination or other conclusion of this Agreement.

**(iii) Continuing Privacy and Security Obligation.** The Business Associate's obligation to protect the privacy and safeguard the security of the Covered Entity's Protected Health Information as specified in this Agreement will be continuous and survive termination or other conclusion of this Agreement.

## IX.  Miscellaneous Provisions

**(a)  *Definitions.*** All terms that are used but not otherwise defined in this Agreement shall have the meaning specified under HIPAA, including its statute, regulations and other official government guidance.

**(b)  *Inspection of Internal Practices, Books, and Records.*** The Business Associate will make its internal practices, books, and records relating to its use and disclosure of the Covered Entity's Protected Health Information available to the Covered Entity and to HHS to determine compliance with the HIPAA Rules.

**(c)  *Amendment to Agreement.*** This Amendment may be amended only by a written instrument signed by the parties. In case of a change in applicable law, the parties agree to negotiate in good faith to adopt such amendments as are necessary to comply with the change in law.

**(d)  *No Third-Party Beneficiaries.*** Nothing in this Agreement shall be construed as creating any rights or benefits to any third parties.

**(e)  *Regulatory References.*** A reference in this Business Associate Agreement to a section in the Privacy Rule means the section as in effect or as amended.

**(f)  *Survival.*** The respective rights and obligations of the Business Associate under Section IX(f) of this Agreement shall survive the termination of this Agreement.

**(g)** *Interpretation.* Any ambiguity in this Agreement shall be resolved to permit the Covered Entity to comply with the HIPAA Rules.

**(h)** *Notices.* All notices hereunder shall be in writing and delivered by hand, by certified mail, return receipt requested or by overnight delivery. Notices shall be directed to the parties at their respective addresses set forth in the first paragraph of this Business Associate Agreement or below their signature, as appropriate, or at such other addresses as the parties may from time to time designate in writing.

**(i)** *Entire Agreement; Modification.* This Business Associate Agreement represents the entire agreement between the Business Associate and the Covered Entity relating to the subject matter hereof. No provision of this Business Associate Agreement may be modified, except in writing, signed by the parties.

**(j)** *Indemnification.* Each Party agrees to indemnify, defend and hold harmless each other Party, its affiliates and each of their respective directors, officers, employees, agents or assigns from and against any and all actions, causes of actions, claims, suits and demands whatever, and from all damages, liabilities, costs, charges, debts and expenses whatever (including reasonable attorneys' fees and expenses related to any litigation or other defense of any claims), which may be asserted or for which they may now or hereafter become subject arising in connection with (i) any misrepresentation, breach of warranty or non-fulfillment of any undertaking on the part of the Party to the Agreement and (ii) any claims, demands, awards, judgments, actions, and proceedings made by any person or organization arising out of any way connected with the Party's performance.

**(k)** *Assistance in Litigation or Administrative Proceedings.* The Business Associate shall make itself, and any subcontractors, employees or agents assisting the Business Associate in the performance of its obligations under this Agreement, available to the Covered Entity, at no cost to the Covered Entity, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against the Covered Entity, its directors, officers, or employees based upon a claimed violation of HIPAA, the HIPAA regulations, or other laws relating to security and privacy, except where the Business Associate or its subcontractors, employees, or agents are named as an adverse party.

**(l)** *Binding Effect.* This Business Associate Agreement shall be binding upon the parties hereto and their successors and assigns.

**(m) Governing Law, Jurisdiction, and Venue**. This Agreement shall be governed by the law of the State of Georgia, except to the extent preempted by federal law.

**(n) Severability**. The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**(o) Construction and Interpretation**. The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. This Agreement has been negotiated by the parties at arm's-length and each of them has had an opportunity to modify the language of the Agreement. Accordingly, the Agreement shall be treated as having been drafted equally by the parties and the language shall be construed as a whole and according to its fair meaning. Any presumption or principle that the language is to be construed against any party shall not

apply. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**In Witness Whereof**, the parties hereto have caused this Agreement to be executed as of the date last written below.

**BUSINESS ASSOCIATE:**                    **COVERED ENTITY:**

Quantum IQ, LLC                            GIOA Benefit Trust Fund

DocuSigned by:                             DocuSigned by:

*John M. Drye*                             *Randy Smith*

2B89489678B479...                          98B10337F9BD423...

By:   John M. Drye, Esq.                   By: Randy Smith

Title:  CEO                                Title: Trustee

Date: 12/14/2021                           Date: 12/13/2021

**SPONSOR:**

Guardian Independent Operator Association, Inc.

DocuSigned by:

*Randy Smith*

98B10337F9BD425...

By:   Randy Smith

Title:  Executive Director

Date: 12/13/2021

# INITIAL STATEMENT OF WORK

**ATTACHMENT 2**

**STATEMENT OF WORK #1**
**for GIOA**

This Statement of Work #1 ("**SOW**"), effective as of [January 1, 2022] ("**SOW Effective Date**"), is entered into by and between Quantum IQ, LLC ("WORLD") and Guardian Independent Operator Association, Inc. ("GIOA"). This SOW is incorporated by reference and subject to and governed by the terms and conditions set forth in the *Professional Services Agreement* by and between WORLD and GIOA effective January 1, 2020 (the "**Agreement**").

This SOW and the Agreement constitute the complete agreement regarding the Services provided under this SOW.  Unless otherwise defined herein, all capitalized terms used in this SOW shall have the meaning ascribed to them in the Agreement.

| 1.  Services Overview |
|---|

This SOW covers WORLD's delivery of Services, deliverables and Work Product as further described herein relating to WORLD serving as a back office administrative arm of GIOA & Operator facing concierge service team.

WORLD will assist GIOA in (1) Handing day-to-day administrative services surrounding the benefits offerings to GIOA members, (2) Management oversight of related vendors of GIOA offerings related to employee benefits.

| 2.  Detailed Description of Services, Work Product and Other Deliverables |
|---|

World will perform the following Services and provide to GIOA the following Work Product and other deliverables during the SOW Term (defined below):

1. **Triage Owner/Operator Issues – Establish Concierge Customer Service Center**
   At all times it is WORLD's #1 job to provide an exceptional member experience
   1st point of contact for GIOA Owner/Operators members
   Answer phone/email inquiries in a timely and respectful manner
   Answer questions to the best of our ability based on the training & access provided
   Escalate issues with vendor partners as they are presented
   Provide continued follow-up Owner/Operator until resolution
   Follow-up Friday with Owner/Operators who have an issue that is outstanding to provide an update
   Answer general questions on FCR report timing and content
2. **Platform Oversight**
   Manage FB Forum
   Manage the contact of the GIOA.info website in partnership with Mercer
   Provide technical support to Benjamin Bailey relative to WordPress/GIOA.info
   Management of the GOIA Dashboard & scheduled improvements
   Development of systems training programs for GIOA Operators
   System testing services at the Client level.

3. **Communications (Strategy Management & Execution)**
   GIOA Member (operator facing) communication
   GOIA New member inquiries, modified Step # 1 with handoff to Mercer for remaining steps
   GIOA Communication Materials as it relates to any current or future custom pieces
   GIOA Communication OE Materials; prepare & review with Mercer providing final approval
   Assist with the coordination of the 2022 Town Hall Meetings and beyond
   Develop & manage all email/text communication strategies (automate away from Survey monkey)

4. **Management (Manage the process through to Decision Level)**
   Partner with Benefit Focus to review current processes and seek improvement where applicable
   Act as a liaison between current & future partners; (ie; handling of the current GIOA Tuesday calls)
   Handle accounting & invoicing functions as it relates to carrier credits & membership dues
   Manage Life Claims process in partnership with applicable carriers & situation
   Store Transition Management
   Store Closing Management

5. **Advisory**
   Compliance support in partnership with current GIOA counsel
   State DOI or DOL inquiry management oversight
   Manage all renewal discussions moving forward starting with the 2022 renewal
   Product Development Managers
   Data Integration Management (End-to-End process re-development)

6. **Vendor Management at Time of Execution**
   Benefit Focus Oversight
       Audits of reporting and automation
       Weekly & on-demand management calls
       Escalation of complaints
       Claims management oversight and handoff
       Oversee benchmark reporting and service quality
   Ben & GIOA Website
       Technical support and advanced programming staffing (WordPress expertise)
       Website updates and bi-annual edits
       Marketing support
   Mercer
       <u>Daily</u> and Weekly administration meetings
       Broker Management
       Direct broker in areas of need
       Audit or broker administrative services until transitioned to TPA
       Premium management oversight (fiduciary duty)
   Tri-Star
       No responsibilities of management or oversight with Tri-Star (Exclusively Mercer)
       Observation role to confirm high industry standards.
       Review all benchmark reporting and service quality
       Support claims assistance for Affinity Owner/operators and Team members

7. **Affinity Plan Operators**
   Broker (Mercer) maintains oversight management
   Provide "Observation Management" services for Affinity Operators (Mercer/Tri-Star/Vendors). Observe and report back impressions to GIOA Executive Board
   Develop parallel track to the AHP plan for membership growth

8. **Create and Run a Membership Department**
   Design process for "onboarding" new members
   Coordinate with GIOA Board on new member inquiries
   Manage the onboarding process
   Create membership fee audit and tracking system.
   Membership accounting and tracking process
   Membership Development staff (promotional programs, CFA conventions, materials)
   GIOA Dashboard updates and oversight
   Develop and manage a financial budget
   Financial budget to be derived from carrier credits.

9. **2022 options (Future)**
   Design and create Video content for GIOA
   Implement a Wellness Letters campaign
   HR Support HOTLINE (Value Add Benefit)
   Select and present Value Add programs and services (non-insurance) to GIOA Board
   Select and present Value Add insurance, financial and planning Services to GIOA Board
   Realtime Happiness Score reporting for GIOA Board or membership
   Vendor Management and negotiation support for future partners.

Such Services, Work Product and other deliverables shall be provided in accordance with and conform in all material respects with the Specifications (defined below) set out above.

Any work commenced prior to the SOW Effective Date in connection with this SOW herein shall be subject to and governed by the terms and conditions of this SOW and the Agreement.

---

**3.  SOW Term & Project Schedule**

SOW Term: The term of this SOW will commence on the SOW Effective Date and end at the termination of the Professional Services Agreement ("**SOW Term**").

---

**4.  Project Fees & Expenses**

All pricing shall be in U.S. dollars.

Fees: Fees shall be paid to WORLD on a monthly basis according to the Professional Services Agreement. ("**Project Fees**").

Invoicing Schedule: WORLD will invoice GIOA the Project Fees in accordance with the Agreement of the Services, Work Product and deliverables set forth in the Professional Services Agreement. All fees are due and payable in accordance with the Agreement.

Expenses: Day-to-day expenses are included as part of the Project Fees. If extenuating expenses are pre-approved by GIOA's Executive Director in writing, GIOA will reimburse expense amounts invoiced in accordance with the Agreement.

## 5. Acceptance

GIOA will promptly review all Services, deliverables and/or Work Product to determine whether those Services, deliverables and Work Product conform to the specifications outlined in this SOW (the "**Specifications**"). If GIOA determines that the Services, deliverables or Work Product do not meet such Specifications, GIOA shall notify WORLD in writing (email shall suffice). WORLD will promptly correct all material nonconformities in the Services, deliverables and Work Product without any additional cost to GIOA. If there is a dispute between GIOA and WORLD pertaining to performance or quality of the Services, deliverables and/or Work Product, GIOA will notify Service Provider of the dispute and of GIOA's concerns regarding the Services, deliverables and/or Work Product, in writing, within fifteen (15) business days of receipt of the Service, deliverable or Work Product, as applicable. In such event, GIOA will allow WORLD a reasonable time period, not to exceed thirty (30) days, to correct the concern. The Services, deliverables and Work Product will be accepted upon WORLD's delivery and GIOA's written acceptance of all Services, deliverables and/or Work Product ("**Acceptance**").

## 6. GIOA's Responsibilities

GIOA shall be solely responsible for the accuracy and completeness of all direction and information that it furnishes to WORLD and/or vendors or insurers, and shall sign any required application, agreement or SOW necessary for WORLD to conduct its responsibilities under this SOW. WORLD shall not be responsible to verify the accuracy or completeness of any information that GIOA provides, and WORLD shall be entitled to rely on any information or direction. WORLD shall have no liability for any errors, deficiencies or omissions in any direction provided to GIOA, including benefits related liability, that are based on inaccurate or incomplete information provided to WORLD by GIOA.

GIOA shall meet regularly, and in sufficient enough manor, with WORLD so that WORLD will have a clear direction of GIOA's goals, requests and expectations of WORLD. GIOA shall also meet regularly, and in sufficient manor, with WORLD so as to review all SOW activities WORLD is providing and approve or give direction as to approval or modifications GIOA instructs.

GIOA shall inform WORLD of other vendor roles, responsibilities or SOWs that might impact the ongoing efforts of WORLD to execute its duties under this SOW.

## 8. Documentation

WORLD will document the Work Product, deliverables and the results of the Services as outlined in this SOW. The Services, deliverables, Work Product and applicable documentation will be presented to GIOA for review and approval, if necessary, as agreed to on a case-by-case basis.

World will present "Metrics" of work performance on a periodic basis for GIOA review and approval. Such Metrics may include:

Monthly *Stewardship Report*
Project specific write-ups
Customer satisfaction reporting and testimonials

**9. Change Orders**

Changes to this SOW will be processed in accordance with the procedure described in the Agreement. Changes to this SOW may be made using the Change Order template attached to the Agreement, and shall be effective only upon mutual execution.

 

     **IN WITNESS WHEREOF,** the parties' authorized representatives have executed this SOW to be effective as of the SOW Effective Date.

**QUANTUM IQ, LLC**

By: *John M. Drye*
DocuSigned by:
2D89A48967B6479...
(*Signature*)

Name: John M. Drye, Esq.

Title: CEO

Date: 12/14/2021

**GUARDIAN INDEPENDENT OPERATOR ASSOCIATION, INC.**

By: *Randy Smith*
DocuSigned by:
98B10357F98D425...
(*Signature*)

Name:  Randy Smith

Title:  Executive Director

Date: 12/13/2021

**Attachment 2A**
**Change Order Template**

This Change Order # ____ ("**Change Order**") effective as of _____, 202____ (the "**Change Order Effective Date**") amends Statement of Work #____ by and WORLD and GIOA dated _____ (the "**Statement of Work**" or "**SOW**"), entered into and governed under the Professional Services Agreement by and between Service Provider and Delta dated_____ (the "**Agreement**").

By signing this Change Order, GIOA hereby authorizes WORLD to proceed with the Services as identified herein.  Terms outlined in this Change Order shall take precedence over similar terms outlined in the SOW.  Any capitalized terms in this Change Order not herein defined retain the meaning given to them in the SOW.

h          t d B          it          _____


| ange  escri  tion |
|---|


| ange    stification |
|---|


| ange  m  act |
|---|

th t b  b    i di t  h t r    r i    t d b th    r    d h      r  id  d t i d d  ri ti    th
i    t

| Area of  m  act | es  o | etailed  escri  tion of  m  act |
|---|---|---|
| i |  |  |
| h d |  |  |
| r |  |  |
| i  i    t |  |  |
| th r |  |  |

th r i  i  i  i    t      r  id  dditi    i    r  ti  b

dditi        t  _____

di    r  i i    _____

rt          ib    r    t          _____


r                                    t


t                                    t

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC
_____

11175 Cicero Drive, Suite 500
_____

Alpharetta, GA, 30022
_____

Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,
_____

Randy Smith, Jonathan Hollis, Justin Mize,
_____

Eastgate   Worldwide, LLC, and   Pangeaeffect,   LLC
_____

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| k ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING: PREVIOUS CASE NO. _____ |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:  Daniel Roth, 2652 S Main St., Apt 1373, Kennesaw, GA 30144

 You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name:  Jill Dunn, Ga. Bar No. 602155
_____

Address:  100 Galleria Parkway, Suite 100,
_____

City, State, Zip Code:  Atlanta, Georgia 30339-5948         Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*

 Served, this _____ day of _____, 20_____.      _____
                                                                DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.      _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC

11175 Cicero Drive, Suite 500

Alpharetta, GA, 30022

Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,

Randy Smith, Jonathan Hollis, Justin Mize,

Eastgate   Worldwide, LLC, and   Pangeaeffect,   LLC

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [x] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING: PREVIOUS CASE NO. _____ | |

## SUMMONS

RANDY SMITH, 3620 Ridgewater Trail, Marietta, Georgia 30068

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Jill Dunn, Ga. Bar No. 602155

Address: 100 Galleria Parkway, Suite 100,

City, State, Zip Code: Atlanta, Georgia 30339-5948          Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*

Served, this _____ day of _____, 20_____.          _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.          _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of <u>FULTON</u> County

| **For Clerk Use Only** |
|---|
| Date Filed <u>07-25-2025</u>     **Case Number** _____ |
| **MM-DD-YYYY** |

**Plaintiff(s)**

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| LLC | QUANTUM | IQ | | |
| | | | | |
| | | | | |
| | | | | |

**Defendant(s)**

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| ROTH | DANIEL | | | |
| PALMER | MICHAEL | | | |
| SMITH | RANDY | | | |
| HOLLIS | JONATHAN | | | |

**Plaintiff's Attorney** <u>JILL R. DUNN</u>     **State Bar Number** <u>602155</u>     Self-Represented ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☒ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
**Case Number**                              **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of __FULTON__ County

| For Clerk Use Only |
|---|
| Date Filed __07-25-2025__     Case Number _____ |
| **MM-DD-YYYY** |

**Plaintiff(s)**

| LLC | QUANTUM | IQ | | |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

| MIZE | JUSTIN | | | |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| LLC | EASTGATE | WORLDWIDE | | |
| Last | First | Middle I. | Suffix | Prefix |
| LLC | PANGEAEFFECT | | | |
| Last | First | Middle I. | Suffix | Prefix |
| | | | | |
| Last | First | Middle I. | Suffix | Prefix |

Plaintiff's Attorney __JILL R. DUNN__     State Bar Number __602155__     Self-Represented ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☒ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____     _____
**Case Number**                    **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____     **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

## STATE COURT OF FULTON COUNTY
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC

11175 Cicero Drive, Suite 500

Alpharetta, GA, 30022

Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,

Randy Smith, Jonathan Hollis, Justin Mize,

Eastgate    Worldwide, LLC, and    Pangeaeffect,    LLC

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [x] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:    EASTGATE WORLDWIDE, LLC, 3460 Preston Ridge Road, Suite 150, Alpharetta, Georgia 30005

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Jill Dunn, Ga. Bar No. 602155

Address: 100 Galleria Parkway, Suite 100,

City, State, Zip Code: Atlanta, Georgia 30339-5948          Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

***SERVICE INFORMATION:***

Served, this _____ day of _____, 20_____.    _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.    _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC
11175 Cicero Drive, Suite 500
Alpharetta, GA, 30022
Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,
Randy Smith, Jonathan Hollis, Justin Mize,
Eastgate   Worldwide, LLC, and   Pangeaeffect,   LLC
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [x] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

## SUMMONS

TO THE ABOVE NAMED-DEFENDANT:  JONATHAN HOLLIS, 1307 Marietta Country Club Dr NW, Kennesaw, Georgia 30152

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:
Name: Jill Dunn, Ga. Bar No. 602155
Address: 100 Galleria Parkway, Suite 100,
City, State, Zip Code: Atlanta, Georgia 30339-5948     Phone No.:470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*
Served, this _____ day of _____, 20_____.   _____
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.   _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC
_____
11175 Cicero Drive, Suite 500
_____
Alpharetta, GA, 30022
_____
Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,
_____
Randy Smith, Jonathan Hollis, Justin Mize,
_____
Eastgate    Worldwide, LLC, and    Pangeaeffect,    LLC
_____
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [x] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

## SUMMONS

JUSTIN MIZE, 16434 75th Way N., West Palm Beach Florida 33418

TO THE ABOVE NAMED-DEFENDANT:

  You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Jill Dunn, Ga. Bar No. 602155

Address: 100 Galleria Parkway, Suite 100,

City, State, Zip Code: Atlanta, Georgia 30339-5948    Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*

Served, this _____ day of _____, 20_____.    _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.    _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

GEORGIA, FULTON COUNTY

DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**
Civil Division

CIVIL ACTION FILE #: _____

QUANTUM IQ, LLC

11175 Cicero Drive, Suite 500

Alpharetta, GA, 30022

Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,

Randy Smith, Jonathan Hollis, Justin Mize,

Eastgate    Worldwide, LLC, and    Pangeaeffect,    LLC

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| k ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:   MICHAEL PALMER, 536 Branyan Trail, Alpharetta, GA 30004

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Jill Dunn, Ga. Bar No. 602155

Address: 100 Galleria Parkway, Suite 100,

City, State, Zip Code: Atlanta, Georgia 30339-5948          Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

***SERVICE INFORMATION:***

Served, this _____ day of _____, 20_____.          _____
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____

This _____ day of _____, 20_____.      _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
7/25/2025 2:56 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY**                                    DO NOT WRITE IN THIS SPACE

**STATE COURT OF FULTON COUNTY**           CIVIL ACTION FILE #: _____
Civil Division

QUANTUM IQ, LLC
_____
11175 Cicero Drive, Suite 500
_____
Alpharetta, GA, 30022
_____
Plaintiff's Name, Address, City, State, Zip Code

vs.

Daniel Roth, Michael Palmer,
_____
Randy Smith, Jonathan Hollis, Justin Mize,
_____
Eastgate    Worldwide, LLC, and    Pangeaeffect,    LLC
Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $_____ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| k ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $_____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING: PREVIOUS CASE NO. _____ | |

## SUMMONS

TO THE ABOVE NAMED-DEFENDANT:    PANGEAEFFECT LLC,  401 E 8th St, Suite 214, Sioux Falls, South Dakota 57103

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Jill Dunn, Ga. Bar No. 602155

Address: 100 Galleria Parkway, Suite 100,

City, State, Zip Code: Atlanta, Georgia 30339-5948          Phone No.: 470-588-8023

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*
Served, this _____ day of _____, 20_____.    _____
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for _____

_____
This _____ day of _____, 20_____.    _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
25EV007872
8/1/2025 1:02 PM
Donald Talley, Clerk
Civil Division

**AFFIDAVIT OF SERVICE**

| Case: 25EV007872 | Court: IN THE STATE COURT OF FULTON, STATE OF GEORGIA Civil Division | County: Fulton, GA | Job: 13827654 (25EV007872) |
|---|---|---|---|
| Plaintiff / Petitioner: QUANTUM IQ, LLC | | Defendant / Respondent: MICHAEL PALMER, | |
| Received by: Ready Serve-Process Service Investigations, LLC | | For: FREEMAN MATHIS & GARY, LLP | |
| To be served upon: Michael Palmer | | | |

I, Ronnie N. Stewart, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Cathryn Palmer / 536 BranyanTrail Alpharetta, Ga. 30004 (Wife of the subject, who accepted on his behalf.)

**Manner of Service:** Substitute: On the 30th of July 2025 at 19:41/7:41pm EDT

**Documents:** SUMMONS / PLAINTIFF'S COMPLAINT FOR DAMAGES / PARTIES, JURISDICTION AND VENUE / (EXHIBIT'S 1A and 1B) / INITIAL STATEMENT OF WORK

**Additional Comments:**
Description of Person Served: Age:47-52 Sex:F Race:white Ht:5"-6" Wt:160lbs. Hair:Sandy-Blond Eyes:Blk/Brw Glasses: No Other: No

_____   8/1/2025
Ronnie N. Stewart          Date

Subscribed and sworn to before me by the affiant who is
personally known to me.

_____
**Notary Public**

06/01/2025        01/24/2026
**Date**          **Commission Expires**

Ready Serve-Process Service Investigations, LLC
PO Box 496
Redan, GA 30074
7708517645

State Court of Fulton County
**E-FILED**
25EV007872
8/5/2025 1:29 PM
Donald Talley, Clerk
Civil Division

## AFFIDAVIT OF SERVICE

State of Georgia                    County of Fulton                    State Court

Case Number: 25EV007872

Plaintiff: **Quantum IQ LLC**
vs.
Defendant: **Daniel Roth, et al**

For:
Jill Dunn
Freeman Mathis & Gary LLP
100 Galleria Pkwy
Ste 1600
Atlanta, GA 30339

Received by Ancillary Legal Corporation on the 1st day of August, 2025 at 12:55 pm to be served on
**Jonathan Hollis, 1307 MARIETTA COUNTRY CLUB DRIVE NW, Kennesaw, GA 30152**

I, Clark Richardson, being duly sworn, depose and say that on the **2nd day of August, 2025** at **8:46 am, I:**

**SUBSTITUTE** served by delivering a true copy of the **Summons, Complaint for Damages, Exhibits to Individual did not provide first name Individual did not provide last name** as Co-Resident at the address of: **1307 MARIETTA COUNTRY CLUB DRIVE NW, Kennesaw, GA 30152**, the within named person's usual place of **Abode**, who resides therein, and is a person of suitable age and discretion.

**Additional Information pertaining to this Service:**
8/2/2025  8:46 am  Perfected substitute service at 1307 Marietta Country Club Drive NW Kennesaw, GA 30152. Arrived at target location met by a Caucasian female who identified herself as the target's wife and accepted service.

**Description** of Person Served: Age: ~45, Sex: F, Race/Skin Color: Caucasian, Height: ~5'6, Weight: 160, Hair: Blonde, Glasses: -

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

**Clark Richardson**
Process Server

Subscribed and Sworn to before me on the 4
day of _August_, _2025_ by the affiant
who is personally known to me.

NOTARY PUBLIC

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025013259
Ref: 118201

VALERIE A RICHARDSON
MY COMMISSION EXPIRES
JANUARY
11
2029
CHEROKEE COUNTY
NOTARY PUBLIC

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0c

State Court of Fulton County
**E-FILED**
25EV007872
8/6/2025 1:55 PM
Donald Talley, Clerk
Civil Division

# AFFIDAVIT OF SERVICE

State of Georgia                County of Fulton                State Court

Case Number: 25EV007872

Plaintiff:
**Quantum IQ LLC**

vs.

Defendant:
**Daniel Roth, et al**

For:
Jill Dunn
Freeman Mathis & Gary LLP
100 Galleria Pkwy
Ste 1600
Atlanta, GA 30339

Received by Ancillary Legal Corporation on the 1st day of August, 2025 at 1:00 pm to be served on **Randy Smith, 3620 RIDGEWATER TRAIL, Marietta, GA 30068**.

I, Jerald Luster, being duly sworn, depose and say that on the **2nd day of August, 2025** at **11:57 am**, I:

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons, Complaint for Damages, Exhibits** to: **Randy Smith** at the address of: **3620 RIDGEWATER TRAIL, Marietta, GA 30068**.

**Additional Information pertaining to this Service:**
8/2/2025  11:57 am  Perfected individual service at 3620 Ridgewater Trail Marietta, GA 30068. Serve was executed in the driveway of the listed address to the subject. He stated his name and accepted the serve by direct delivery. Male, white, 60-70 yrs old, 5'4, 170 lbs, grey hair and glasses.

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true. I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the __5__
day of __Aug__, __2025__ by the affiant
who is personally known to me.

_____
NOTARY PUBLIC

**Jerald Luster**
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025013260
Ref: 118201

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

LATISHA TURNER
NOTARY
GEORGIA
EXPIRES
APR 6, 2026
PUBLIC
COBB COUNTY

State Court of Fulton County
**E-FILED**
25EV007872
8/11/2025 8:46 AM
Donald Talley, Clerk
Civil Division

## AFFIDAVIT OF SERVICE

State of Georgia                    County of Fulton                    State Court

Case Number: 25EV007872

Plaintiff:
**Quantum IQ LLC**

vs.

Defendant:
**Daniel Roth, et al**

For:
Jill Dunn
Freeman Mathis & Gary LLP
100 Galleria Pkwy
Ste 1600
Atlanta, GA 30339

Received by Ancillary Legal Corporation on the 1st day of August, 2025 at 12:50 pm to be served on **Eastgate Worldwide LLC, 3460 Preston Ridge Road, Ste 150, Alpharetta, GA 30005**.

I, Joyce Clemmons, being duly sworn, depose and say that on the **4th day of August, 2025** at **3:05 pm, I:**

served Eastgate Worldwide LLC by delivering a true copy of the **Summons, Complaint for Damages, Exhibits** to: **Shannon Breton** as **Authorized to Accept** for **Eastgate Worldwide LLC**, at the address of: **3460 Preston Ridge Road, Ste 150, Alpharetta, GA 30005**.

**Additional Information pertaining to this Service:**
8/4/2025  3:05 pm  Perfected corporate service at 3460 Preston Ridge Road Ste 150, Alpharetta, GA 30005. Served Shannon Breton, Guest Services Coordinator/Authorized Recipient female, white, 50's, 5'7- 5'10, 150-190 lbs., brunette, and wearing glasses.

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the 6th day of _August_, 2025 by the affiant who is personally known to me.

NOTARY PUBLIC

**Joyce Clemmons**
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2025013258
Ref: 118201

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0b

State Court of Fulton County
**E-FILED**
25EV007872
8/12/2025 12:19 PM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| QUANTUM IQ, LLC | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. 25EV007872 |
| DANIEL ROTH, MICHAEL PALMER, RANDY SMITH, JONATHAN HOLLIS, JUSTIN MIZE, EASTGATE WORLDWIDE, LLC, and PANGEAEFFECT LLC, | |
| Defendants. | |

## **RULE 5.2 CERTIFICATE OF SERVICE**

Pursuant to Rule 5.2 of the Uniform Superior Court Rules, I hereby certify that on August 11, 2025, I served copies of the following:

- ***PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS***

by US Mail and statutory electronic service upon Defendants of record as follows:

Daniel Roth
2652 S Main St. Apt 1373
Kennesaw, GA 30144
drothx@gmail.com

Michael Palmer
536 Branyan Trail
Alpharetta, GA 30004
Michael.palmer86@gmail.com

Randall Smith
3620 Ridgewater Trail
Marietta, GA 30068
randysmith1954@gmail.com

Jonathan Hollis
1307 Marietta Country Club Dr NW
Kennesaw, GA 30152
Hollisfamily05@gmail.com

Justin Mize
16434 75th Way N
West Palm Beach, FL 33418
mize.justin@gmail.com

Eastgate Worldwide
3640 Preston Ridge Rd
Suite 150
Alpharetta, GA 30005
infor@eastgateww.com

PangeaEffect, LLC c/o Jenna Puetz
401 8th St. Suite 214
Sioux Falls, SD 57103
inquiry@pangeaeffect.com

This 12th day of August, 2025.

[*Signature on following page.*]

/s/ Steven D. Ginsburg
JILL R. DUNN
Georgia Bar No. 602155
STEVEN D. GINSBURG
Georgia Bar No. 121055
*Attorneys for Plaintiff*

**FREEMAN MATHIS & GARY, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 – phone
(833) 330-3669 – fax
steven.ginsburg@fmglaw.com
jdunn@fmglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I submitted the foregoing **RULE 5.2 CERTIFICATE OF SERVICE** to the Clerk of Court using the Odyssey e-filing system which will automatically send electronic mail notification and a copy to counsel of record to this matter, and by U.S. Mail and email to the following:

Daniel Roth
2652 S Main St. Apt 1373
Kennesaw, GA 30144
drothx@gmail.com

Michael Palmer
536 Branyan Trail
Alpharetta, GA 30004
Michael.palmer86@gmail.com

Randall Smith
3620 Ridgewater Trail
Marietta, GA 30068
randysmith1954@gmail.com

Jonathan Hollis
1307 Marietta Country Club Dr NW
Kennesaw, GA 30152
Hollisfamily05@gmail.com

Justin Mize
16434 75th Way N
West Palm Beach, FL 33418
mize.justin@gmail.com

Eastgate Worldwide
3640 Preston Ridge Rd
Suite 150
Alpharetta, GA 30005
infor@eastgateww.com

PangeaEffect, LLC c/o Jenna Puetz
401 8th St. Suite 214
Sioux Falls, SD 57103
inquiry@pangeaeffect.com

This 12th day of August, 2025.

*/s/ Steven D. Ginsburg*
JILL R. DUNN
Georgia Bar No. 602155
STEVEN D. GINSBURG
Georgia Bar No. 121055
*Attorneys for Plaintiff*

**FREEMAN MATHIS & GARY, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339-5948
(770) 818-0000 – phone
(833) 330-3669 – fax
steven.ginsburg@fmglaw.com
jdunn@fmglaw.com

State Court of Fulton County
**E-FILED**
25EV007872
8/18/2025 8:43 AM
Donald Talley, Clerk
Civil Division

## AFFIDAVIT OF NON-SERVICE

| Case:<br>25EV007872 | Court:<br>IN THE STATE COURT OF FULTON COUNTY STATE OF GEORGIA Civil Division | County:<br>Fulton, GA | Job:<br>13827777 (25EV007872) |
|---|---|---|---|
| Plaintiff / Petitioner:<br>QUANTUM IQ, LLC | | Defendant / Respondent:<br>DANIEL ROTH, | |
| Received by:<br>Ready Serve-Process Service Investigations, LLC | | For:<br>FREEMAN MATHIS & GARY, LLP | |
| To be served upon:<br>Daniel Roth | | | |

I, Ronnie N. Stewart, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**    Daniel Roth / 2652 South Main Street, Kennesaw , Ga. 30144 (The Lacy Upscale Apartment / Townhomes complex: Leasing Office hours, Monday-Friday 9:00am-6:00pm & Saturday 10:00am-5:00pm, Closed Sundays) I spoke with Jade Mayfield, Assistant Manager-Phone:404.857.0330 Email:assistant@thelacykennesaw.com

**Manner of Service:**    Non-Serve: On the 9th of August 2025 at 12:30pm EDT

**Documents:**    SUMMONS / PLAINTIFF'S COMPLAINT FOR DAMAGES PARTIES, JURISDICTION AND VENUE / (EXHIBIT'S 1A and 1B) / INITIAL STATEMENT OF WORK

**Additional Comments:**
Attempts: No Answer At Door - NAAD
1) 7/30/25 at 18:02 / 6:02pm NAAD
2) 7/31/25 at 09:10am NAAD
3) 8/5/25 at 14:37/2:37pm NAAD
4) 8/9/25 at 9:30am-12:45pm NAAD

_____  8/5/2025
Ronnie N. Stewart          Date
PDE:050374

Ready Serve-Process Service Investigations, LLC
PO Box 496
Redan, GA 30074
7708517645

Subscribed and sworn to before me by the affiant who is
personally known to me.

_____
Notary Public
8/15/2025              09||1|2028
Date              Commission Expires

## AFFIDAVIT OF SERVICE

| Case:<br>25EV007872 | Court:<br>STATE COURT OF FULTON COUNTY STATE OF GEORGIA | County:<br>FULTON, GA | Job:<br>13849157 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>QUANTUM IQ, LLC | | Defendant / Respondent:<br>DANIEL ROTH, MICHAEL PALMER, RANDY SMITH, JONATHAN HOLLIS, JUSTIN IZE, EASTGATE WORLDWIDE, LLC, AND PANGEAEFFECT LLC | |
| Received by:<br>Blue Light Investigations LLC | | For:<br>FMG LAW | |
| To be served upon:<br>PANGEAEFFECT LLC | | | |

I, Annie Ernster, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:   Alexandria Hewer , COMPANY: 401 EAST 8TH STREET STE 214, SIOUX FALLS, SD 57103
Manner of Service:           Corporation, Aug 1, 2025, 12:36 pm CDT
Documents:                   Summons (Received Aug 1, 2025 at 11:00am CDT)

Additional Comments:
1) Successful Attempt: Aug 1, 2025, 12:36 pm CDT at COMPANY: 401 EAST 8TH STREET STE 214, SIOUX FALLS, SD 57103 received by Alexandria Hewer . Age: 35; Ethnicity: Caucasian; Gender: Female; Weight: 130; Height: 5'3"; Hair: Brown; Other: Director of operations ;
Personally served at 401 E 8th St Suite 214

Fees:   $88.56

*Subscribed and sworn to before me by the affiant who is personally known to me.*



Notary Public

8/4/25                    7/24/30
Date          Commission Expires

JEFFREY TIBKE
SEAL  NOTARY PUBLIC  SEAL
SOUTH DAKOTA

08/04/2025
Annie Ernster                    Date

Blue Light Investigations LLC
300 N. Dakota Ave. Suite 612
Sioux Falls, SD 57104
(605)274-2583

State Court of Fulton County
**E-FILED**
25EV007872
8/18/2025 2:28 PM
Donald Talley, Clerk
Civil Division

State Court of Fulton County
**E-FILED**
25EV007872
8/18/2025 6:15 PM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| QUANTUM IQ, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **CIVIL ACTION FILE NO.** |
| | ) |
| DANIEL ROTH, MICHAEL PALMER, | ) **25EV007872** |
| RANDY SMITH, JONATHAN HOLLIS, | ) |
| JUSTIN MIZE, EASTGATE | ) |
| WORLDWIDE, LLC, and | ) |
| PANGEAEFFECT LLC, | ) |
| | ) |
| **Defendants.** | ) |

## ENTRY OF APPEARANCE

Joseph H. Stuhrenberg, of Burr & Forman LLP, without waiving any of his clients' rights, objections, or defenses in this action, hereby gives notice of his appearance as counsel of record for Defendants Daniel Roth and PangeaEffect LLC, and respectfully requests that all notices, correspondence, pleadings, orders, and other matters relating to this action be served upon him at the following address:

Joseph H. Stuhrenberg
**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244
jstuhrenberg@burr.com

Respectfully submitted this 18th day of August, 2025.

/s/ Joseph H. Stuhrenberg
Joseph H. Stuhrenberg
Georgia Bar No. 398537
jstuhrenberg@burr.com

*Attorney for Defendants Daniel Roth and
PangeaEffect LLC*

62139808 v1

**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of August, 2025, I filed the foregoing **ENTRY OF APPEARANCE** with the Clerk of Court using the Court's electronic filing system, which will automatically send email notification of such filing to all counsel of record:

Jill R. Dunn
Steven D. Ginsburg
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339

/s/ Joseph H. Stuhrenberg
Joseph H. Stuhrenberg
Georgia Bar No. 398537
jstuhrenberg@burr.com

*Attorney for Defendants Daniel Roth and PangeaEffect LLC*

**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

State Court of Fulton County
**E-FILED**
25EV007872
8/18/2025 6:15 PM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| QUANTUM IQ, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **CIVIL ACTION FILE NO.** |
| | ) |
| DANIEL ROTH, MICHAEL PALMER, | ) **25EV007872** |
| RANDY SMITH, JONATHAN HOLLIS, | ) |
| JUSTIN MIZE, EASTGATE | ) |
| WORLDWIDE, LLC, and | ) |
| PANGEAEFFECT LLC, | ) |
| | ) |
| **Defendants.** | ) |

---

## ENTRY OF APPEARANCE

---

William C. Collins, Jr., of Burr & Forman LLP, without waiving any of his clients' rights, objections, or defenses in this action, hereby gives notice of his appearance as counsel of record for Defendants Daniel Roth and PangeaEffect LLC, and respectfully requests that all notices, correspondence, pleadings, orders, and other matters relating to this action be served upon him at the following address:

William C. Collins, Jr.
**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244
wcollins@burr.com

Respectfully submitted this 18th day of August, 2025.

/s/ William C. Collins, Jr.
William C. Collins, Jr.
Georgia Bar No. 178847
wcollins@burr.com

*Attorney for Defendants Daniel Roth and PangeaEffect LLC*

62139588 v1

**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on this 18th day of August, 2025, I filed the foregoing **ENTRY OF APPEARANCE** with the Clerk of Court using the Court's electronic filing system, which will automatically send email notification of such filing to all counsel of record:

Jill R. Dunn
Steven D. Ginsburg
FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339

/s/ William C. Collins, Jr.
William C. Collins, Jr.
Georgia Bar No. 178847
wcollins@burr.com

*Attorney for Defendants Daniel Roth and PangeaEffect LLC*

**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

State Court of Fulton County
**E-FILED**
25EV007872
8/21/2025 2:38 PM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **QUANTUM IQ, LLC,** | ) | |
| | ) | |
| | ) | Civil Action File No. 25EV007872 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DANIEL ROTH, MICHAEL** | ) | |
| **PALMER, RANDY SMITH,** | ) | |
| **JONATHAN HOLLIS, JUSTIN MIZE,** | ) | |
| **EASTGATE WORLDWIDE, LLC, and** | ) | |
| **PANGEAEFFECT LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

## ACKNOWLEDGMENT OF SERVICE

COME NOW, Williams C. Collins, Jr. and Joseph Stuhrenberg, attorneys for Defendants Daniel Roth and PangeaEffect, LLC in the above-styled action, and hereby acknowledge valid and sufficient service of process in this action on behalf of Defendant Daniel Roth as though said Defendant was personally and properly served with process on August 18, 2025. Defendant Roth hereby waives the defenses of insufficiency of process and insufficiency of service of process, but does not waive, and hereby reserves, all other defenses.

This 21st day of August, 2025.

*/s/ Joseph H. Stuhrenberg*
Williams C. Collins, Jr.
Georgia Bar No. 178847
wcollins@burr.com
Joseph Stuhrenberg
Georgia Bar No. 398537
jstuhrenberg@burr.com
*Attorney for Defendants Daniel Roth and PangeaEffect, LLC*

**BURR & FORMAN LLP**
1075 Peachtree Street NE
Suite 3000
Atlanta, GA 30309
Telephone:  (404) 815-3000
Facsimile:  (404) 817-3244

1

Filed with Express Permission By:

/s/ *Jill R. Dunn*
Jill R. Dunn
Georgia Bar No. 602155
jdunn@fmglaw.com

**FREEMAN MATHIS & GARY, LLP**
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339
(770) 818-1409

2

**State Court of Fulton County**
**\*\*E-FILED\*\***
**25EV007872**
**8/26/2025 3:33 PM**
**Donald Talley, Clerk**
**Civil Division**

## RETURN OF SERVICE

**State of Georgia**                    **County of Fulton**                              **State Court**

Case Number: 25EV007872

Plaintiff:
**QUANTUM IQ, LLC**

vs.

Defendant:
**DANIEL ROTH, MICHAEL PALMER, RANDY SMITH, JONATHAN HOLLIS, JUSTIN MIZE,**
**EASTAGTE WORLDWIDE LLC AMD PANGEAEFFECT, LLC**

LIN2025050156

For:
Jill R. Dunn
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339

Received by Lynx Legal Services, on the 1st day of August, 2025 at 11:52 am to be served on **Justin Mize, 16434 75th Way North, West Palm Beach, FL 33418**.

I, Linda Rudnet, do hereby affirm that on the **19th day of August, 2025** at **7:58 am, I:**

**INDIVIDUALLY/PERSONALLY** served **Justin Mize**  by delivering a true copy of the **30-Day Summons and Plaintiff's Complaint for Damages with Exhbits** with the date and hour of service endorsed thereon by me, directly to **Justin Mize** at the given address of: **16434 75th Way North, West Palm Beach, FL 33418**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 40 to 45, Sex: M, Race/Skin Color: Caucasian, Height: 5'11" to 6'4", Weight: 165 to 170, Hair: Dark Blonde, Glasses: N, Eyes: Brown

I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under the penalty of perjury, I declare that I have read the foregoing proof of service, and I attest that the facts stated in it are true.

**Linda Rudnet**
3084

**Lynx Legal Services,**
**a U.S. Legal Support company**
**201 E Pine St., Ste 740**
**Orlando, FL 32801**
**(407) 872-0707**

Our Job Serial Number: LIN-2025050156

State Court of Fulton County
**E-FILED**
25EV007872
8/27/2025 11:15 AM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

QUANUTM IQ, LLC,

   Plaintiff,

v.                                                                CASE NO. 25EV007872

DANIEL ROTH, MICHAEL PALMER,
RANDY SMITH, JONATHAN HOLLIS,
JUSTIN MIZE, EASTGATE
WORLDWIDE, LLC, and
PANGEAEFFECT, LLC,

   Defendants.

## JOINT STIPULATION FOR EXTENSION OF TIME FOR DEFENDANTS TO RESPOND TO COMPLAINT FOR DAMAGES

COMES NOW Defendants, MICHAEL PALMER, RANDY SMITH, JONATHAN HOLLIS, JUSTIN MIZE, and EASTGATE WORLDWIDE, LLC ("Defendants"), together with Plaintiff, QUANTUM IQ, LLC ("Plaintiff"), by and through their undersigned counsel of record, and hereby stipulate and agree that the time for Defendants to respond to Plaintiff's Complaint for Damages shall extend through and include September 18, 2025.

Respectfully submitted this 27th day of August 2025.

/s/ *F. Skip Sugarman*                            /s/ *Jill Dunn*
                                                                   (signed with express permission)
F. Skip Sugarman                                      Jill R. Dunn
Georgia Bar No. 690773                            Georgia Bar No.: 602155
skip@sugarman-law.com                          jdunn@fmglaw.com
Andrew Morales                                         Steven D. Ginsburg
Georgia Bar No. 992193                            Georgia Bar No.: 121055
andrew@sugarman-law.com                    Steven.ginsburg@fmglaw.com

SUGARMAN LAW, LLP                             100 Galleria Parkway, Suite 1600
154 Krog Street NE, Suite 190                  Atlanta, GA 30339
Atlanta, GA 30307                                       770-818-0000
(404) 495-4811

                                                                   *Counsel for Quantum IQ, LLC.*
Alec R. Shelowitz

Florida Bar No. 1010127
E-mail: ashelowitz@zarcolaw.com
E-mail: agarcia@zarcolaw.com
Robert Zarco
Florida Bar No. 502138
E-mail: Rzarco@zarcolaw.com
E-mail: Mlabrador@zarcolaw.com
Victoria Diaz
Floria Bar No. 1058455
E-mail: vidaz@zarcolaw.com
E-mail: Agarcia@zarcolaw.com
Himanshu M. Patel
Florida Bar No. 167223
E-mail: HPatel@zarcolaw.com

**ZARCO EINHORN SALKOWSKI, P.A.**

One Biscayne Tower
2 S. Biscayne Blvd.
34th Floor
Miami, FL 33131
(305) 374-5418

[PRO HAC VICE APPLICATIONS
FORTHCOMING]

*Counsel for Michael Palmer, Randy
Smith, Jonathan Hollis, Justin Mize,
Eastgate Worldwide, LLC.*

**IN THE STATE COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

WORLD INSURANCE ASSOC., INC.,

  Plaintiff,

v.

GUARDIAN INDEPENDENT OPERATOR
ASSOCIATIONS, INC.,

  Defendant.

ESTATE NO. 25DD004635

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **JOINT**

**STIPULATION FOR EXTENSION OF TIME** via Odyssey e-filing to the following

attorneys of record:

Scott T. Bushnell, Esq.
Bushnell & Drye, LLC
11175 Cicero Drive, Suite 500
Alpharetta, GA 30022
sbushnell@bdhalaw.com

This 27th day of August, 2025.

SUGARMAN LAW LLP
154 Krog Street, NE - Suite 190
Atlanta, GA  30307
(404) 495-4811

Counsel for Guardian Independent Operator
Associations, Inc.

/s/ F. Skip Sugarman
_____

F. Skip Sugarman
Georgia Bar No. 690773
skip@sugarman-law.com
Andrew Morales
Geogia Bar No. 992193
Andrew@sugarman-law.com